THE STATE, EX REL. FOREMAN ET AL., *v.* BROWN, SECY. OF STATE.

[Cite as State, ex rel. Foreman, v. Brown, 10 Ohio St. 2d 139.]

(No. 40903—Decided April 19, 1967.)

140

*Messrs. Lucas, Prendergast, Albright & Warren, Mr. Rankin M. Gibson, Mr. Robert B. McAlister* and *Mr. James H. Dolan,* for relators.
*Mr. William B. Saxbe,* attorney general, *Mr. Charles S. Lopeman, Messrs. Bricker, Evatt, Barton & Eckler, Messrs. Peck, Shaffer & Williams* and *Messrs. Power, Griffith, Jones & Bell,* for respondent.
*Mr. Charles R. Miller, Mr. Ralph Rudd* and *Mr. Paul M. Perkins,* for intervenors.

TAFT, C. J. It is first contended that there can be no special election on May 2, 1967, because such election has not been validly called.[1]

Admittedly, Amended Substitute House Joint Resolution No. 22 by its words specifically calls a special election on May 2, 1967, for submission of the proposed Ohio Bond Commission Constitutional Amendment.

In support of the contention that no special election was validly called for May 2, 1967, it is contended (1) that a special election can only be provided for by statute; (2) that no statute provides for a special election on a proposed constitutional

---

[1] This contention, if sustained, would necessarily require the conclusion that there could also be no special election on that day for Issue No. 2, the so-called apportionment amendment. Although that question has not been specifically raised in these proceedings, it is raised in *State, ex rel. Hayes,* v. *Brown, Secy. of State* (case No. 40936), which was filed in this court on April 17, 1967.

amendment on May 2, 1967, or at any other time[2]; and (3) that the only statute providing for submission of a constitutional amendment provides for submission thereof at a general election.

However, Section 1 of Article XVI of the Ohio Constitution provides in part:

"Either branch of *the General Assembly may propose amendments* to this Constitution; and, if the same shall be agreed to by three-fifths of the members elected to each house, such proposed amendments *shall be* entered on the journals, with the yeas and nays, and shall be *submitted* to the electors, for their approval or rejection, on a separate ballot without party designation of any kind, *at either a special or a general election as the General Assembly may prescribe.* * * *" (Emphasis added.)

These words clearly authorize the General Assembly to prescribe that an amendment to the Constitution, proposed by the General Assembly pursuant to that section, be submitted at a special election on a certain date.

Unlike in many other parts of the Ohio Constitution, Section 1 of Article XVI does not require that this action be "by law," *i. e.*, by enactment of a statute. Cf. Section 16 of Article I, Section 21 of Article II, Section 22 of Article II, Section 27 of Article II, Section 4 of Article III, Section 8 of Article IV, Section 3 of Article VI, Section 3 of Article XIII, Section 2 of Article XV, Section 3 of Article XV, Section 8 of Article XV, Section 2 of Article XVI, Section 2 of Article XVII, Section 14 of Article XVIII.

Hence, we are of the opinion that the General Assembly may authorize such special election on a certain date by a joint resolution without enacting a statute.

In *State, ex rel. Attorney General,* v. *Kinney, Secy. of State* (1897), 56 Ohio St. 721, 47 N. E. 569 (cited in the dissenting opinion), which involved Section 2 of Article XVI as in force **before 1912,** there was no constitutional basis whatever for the

---

[2]We agree with the contention that House Bill No. 113 was not passed as an emergency measure and hence cannot be effective until after May 2, 1967. Hence, there is no statute providing for a special election on May 2, 1967, on any proposed constitutional amendment.

action which this court held that the General Assembly could not take by a joint resolution.

Of course, the General Assembly could not prescribe, in its resolution proposing a constitutional amendment, that it be submitted at a special election on a certain date, if Section 1 of Article XVI of the Constitution did not state that such amendment "shall be submitted * * * at * * * a special or a general election as the General Assembly may prescribe."

It may also be noted that, before 1912, Section 1 of Article XVI of the Constitution authorized submission of an amendment proposed by the General Assembly only at "the next election for Senators and Representatives." The present provision, empowering the General Assembly to prescribe for submission at a special election, was not added until 1912.

It is argued that a joint resolution cannot ordinarily repeal a statute. However, in our opinion, if action, taken by the General Assembly pursuant to Section 1 of Article XVI and authorizing a special election on a certain day, does conflict with an unrepealed existing statute, the action so taken pursuant to specific constitutional authority would require a holding that the statute was unconstitutional so far as it conflicted with such action. In the instant case, it is not necessary for us to make such a holding of unconstitutionality because there is no conflict between any statute and the action taken by the General Assembly in Amended Substitute House Joint Resolution No. 22 in calling a special election.[3]

The only statute relied upon as preventing such action is Section 3501.02, Revised Code, which reads:

"General elections in the state and its political subdivisions shall be held as follows:

"(A) For the election of electors of President and Vice-President of the United States, in the year 1932 and every four years thereafter;

---

[3]The words "special election" are not defined in the Constitution. In Section 3501.01 (D), Revised Code, it is stated:

" 'Special election' means any election other than the elections required to be regularly held on the day of a general or primary election, provided that a special election may also be held on the day of a general or primary election."

"(B) For the election of a member of the Senate of the United States, in the years 1932 and 1934, and every six years after each of such years; except as otherwise provided for filling vacancies;

"(C) For the election of Representatives in the Congress of the United States and of elective state and county officers, in the even-numbered years; except as otherwise provided for filling vacancies;

"(D) For municipal and township officers, members of boards of education, members of the State Board of Education, judges and clerks of police and Municipal Courts, in the odd-numbered years;

"(E) Proposed constitutional amendments or proposed measures submitted by the General Assembly or by initiative or referendum petitions to the *voters of the state at large may* be submitted at the general election in any year occurring at least sixty days, in case of a referendum, and ninety days, in the case of an initiated measure, subsequent to the filing of the petitions therefor. Unless provision is made by law or charter for the *submission* of a question or issue *to* the *voters of a county, township, city, village, or school district* at a special election, *no special election* shall be called, and the question or issue shall be submitted at a general election."

If the word "must" or "shall" had been used in the first sentence[4] of paragraph (E) of that statute instead of "may," or if the word "only" had there appeared after "may" or after "submitted," a constitutional question would be presented. However, a mere statutory authorization for submission at a general election cannot be construed as a prohibition of submission at a special election.

The second sentence of that paragraph (E) of the statute obviously applies only to a submission "to the voters of a county, township, city, village, or school district"—not to what is referred to in the first sentence thereof as a submission "to the voters of the state at large."

---

[4]That sentence of the statute would have enabled submission of Issue No. 1 to a general election, if the General Assembly had said nothing in Amended Substitute House Joint Resolution No. 22 about the time of submission.

It is next contended that Amended Substitute House Joint Resolution No. 22 provides for more than one amendment of the Constitution, contrary to the part of Section 1 of Article XVI which reads:

"When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately."

Amended Substitute House Joint Resolution No. 22 purports to submit "*a* proposition to amend Article VIII [singular]" and states "the text of *said* proposed amendment [singular]" as Section 2i of that Article which is set forth therein, and the schedule in that resolution refers to "*this* proposed amendment" and "*the* foregoing proposed amendment [singular]." There is admittedly nothing in Amended Substitute House Joint Resolution No. 22 to indicate an intention to submit, or suggest that the General Assembly believed that it was submitting, more than one proposed amendment to the Constitution.

Apparently, this contention is based upon the premise that an amendment which involves more than one subject, purpose or object is not one amendment but is more than one amendment.

A similar contention was made in *State, ex rel. Burton, Pros. Atty., v. Greater Portsmouth Growth Corp.* (1966), 7 Ohio St. 2d 34, 218 N. E. 2d 446, where this court stated that Section 1 of Article XVI "is directed to those instances where two or more different objects are sought to be accomplished in a single proposal." We stated further that "the singleness of purpose or object sought to be accomplished by the amendment is the test of whether it complies with such section."

With regard to this dicta, it is sufficient to state that our decision in the *Burton case* was based upon our conclusion that the amendment there involved related to a single purpose or object and that all else therein was incidental and reasonably necessary to effectuate the single purpose of the amendment.

It was, therefore, unnecessary for us to determine in that case whether Section 1 of Article XVI prohibited submission of a constitutional amendment as one amendment, if it involved more than one subject, purpose or object.

There is nothing in the Ohio Constitution that will support a reasonable conclusion that a single amendment to that Consti-

tution proposed by the General Assembly can involve no more than one subject, purpose or object. Other proposals of the Constitutional Convention which proposed Section 1 of Article XVI clearly indicate that the words of that section should not be construed as limiting constitutional amendments proposed thereunder to one subject, purpose or object.

Thus, at the same time that the Constitutional Convention proposed Section 1 of Article XVI, it proposed Section 16 of Article II, which reads in part:

"No bill shall contain more than one subject * * *."

It is quite obvious therefore that, if those who submitted Section 1 of Article XVI had intended that each amendment to the Constitution proposed by the General Assembly be confined to one subject, object or purpose, they would have so provided as they did in Section 16 of Article II. They did not.[5]

We conclude, therefore, that there is nothing in the Constitution of Ohio that requires an amendment thereof, proposed by the General Assembly pursuant to Section 1 of Article XVI, to be confined to one subject, purpose or object. Cf. *Reutener* v. *Cleveland* (1923), 107 Ohio St. 117, 141 N. E. 27.

There are other states, which have constitutional provisions providing that, when more than one amendment is submitted at one time, the amendments must be submitted so as to enable the electors to vote on each amendment separately. The general rule in those states is that an amendment may have more than one subject. It is sometimes held however that, although the proposed amendment may embrace several subjects, each subject must bear some reasonable relationship to a single general purpose or object.[6]

---

[5] Other states, which have constitutional provisions prohibiting the enactment of a statute embracing more than a single subject, have held that the statutes have no application to proposed constitutional amendments. See *People, ex rel. Elder, Treas.*, v. *Sours* (1903), 31 Colo. 369, 401, 74 P. 167; *State* v. *Lyons* (1939), 40 Del. 77, 5 A. 2d 495; *Cooney* v. *Foote* (1914), 142 Ga. 647, 83 S. E. 537.

[6] *People, ex rel. Elder, Treas.*, v. *Sours, supra* (31 Colo. 369); *Cooney* v. *Foote, supra* (142 Ga. 647); *Funk* v. *Fielder* (Ky. 1951), 243 S. W. 2d 474; *State, ex rel. Kemp, Atty. Genl.*, v. *Baton Rouge* (1949), 215 La. 315, 40 So. 2d 477; *Fugina* v. *Donovan, Secy. of State* (1960), 259 Minn. 35, 104 N. W. 2d 911; *State, ex rel. Hudd*, v. *Timme, Secy. of State* (1882), 54 Wis. 318, 11 N. W. 785.

146

Thus, under those holdings, if Issue No. 1, in addition to what it now proposes, had also proposed to abolish the home-rule power of municipalities or to increase the length of the terms of members of the General Assembly, it would be regarded as proposing more than one amendment.

However, most states are liberal in interpreting what such a single general purpose or object may be.[7]

If we follow their decisions, Issue No. 1 would be a validly proposed constitutional amendment. The single general object of the proposed Ohio Bond Commission amendment is the creation of a bond commission to raise revenues by issuing bonds and to expend the moneys raised for certain stated public purposes.

---

[7]A case quite similar to the instant one is *State, ex rel. Morris,* v. *Mason, Secy. of State* (1891), 43 La. Ann. 590, 9 So. 776, which held as one amendment an amendment authorizing lotteries and specifying that the revenues generated shall be for schools, levees, charities, pensions, sanitary purposes, and the general fund of the state. See also the following cases which upheld the involved amendments: *State, ex rel. Hay,* v. *Alderson, Secy. of State* (1914), 49 Mont. 387, 142 P. 210; and *Gottstein* v. *Lister, Governer* (1915), 88 Wash. 462, 153 P. 595 (amendment authorizing both initiative and referendum and withholding governor's veto therefrom); *State, ex rel. Hudd,* v. *Timme, Secy. of State, supra* (54 Wis. 318) (amendment providing for election of assembly members and state Senators in districts, for their terms, for their salaries and for biennial sessions); *People, ex rel. Elders, Treas.,* v. *Sours, supra* (74 P. 167) (amendment consolidated a city and a county government, specified its innumerable powers and rights, made general annexation laws applicable thereto, created a new judicial district and terms, etc., of its judges and officers); *State, ex rel. Kemp. Atty. Genl.,* v. *Baton Rouge* (1949), 215 La. 315, 40 So. 2d 477 (amendment extended city boundaries, redistributed political power, created industrial, rural, and urban classifications, and granted new taxing powers to the city); *Winget* v. *Holm* (1932), 187 Minn. 78, 244 N. W. 331 (amendment governed taxation of national banks and authorized income tax); and *Fuzera* v. *Donovan* (1960), 259 Minn. 35, 10 N. W. 2d 911 (amendment authorized Legislature to extend term of session and authorized legislators to serve as notaries). Compare *State, ex rel. Howie, Dist. Atty.,* v. *Brantley, Commr.* (1917), 113 Miss. 786, 74 So. 662 (strict construction), overruled in *Power, Secy. of State,* v. *Robertson* (1922), 130 Miss. 188, 93 So. 769; *State, ex rel. McClurg, Atty. Genl.,* v. *Powell* (1900), 77 Miss. 543, 27 So. 927 (strict construction), criticized in *State, ex rel. Collins, Atty. Genl.,* v. *Jones* (1913), 106 Miss. 522, 64 So. 241. Contra *Kerby, Secy. of State,* v. *Luhrs* (1934), 44 Ariz. 208, 36 P. 2d 549.

If the proposed amendment provided only that a bond commission should be created to raise revenues for public purposes, no one would seriously contend that the proposal included more than one object and that therefore it represented more than one amendment. The fact, that the proposal limits the authority of the commission by specifying the purposes for which the revenues may be raised and used, does not turn the proposal into one for more than one amendment.

The final contention of those, opposing the May 2, 1967, special election with respect to Issue No. 1, is that the schedule prescribing the text of the proposed amendment does not properly describe the proposed amendment. It is even contended that "it is so incomprehensible and misleading as to constitute a fraud upon Ohio electors."

As hereinbefore mentioned, Section 1 of Article XVI governs submission of a constitutional amendment proposed by the General Assembly. It reads:

"Either branch of the General Assembly may propose amendments to this Constitution; and, if the same shall be agreed to by three-fifths of the members elected to each House, such proposed amendments shall be entered on the journals, with the yeas and nays, and shall be submitted to the electors, for their approval or rejection, on a separate ballot without party designation of any kind, at either a special or a general election as the General Assembly may prescribe. Such proposed amendments shall be published once a week for five consecutive weeks preceding such election, in at least one newspaper in each county of the state, where a newspaper is published. If the majority of the electors voting on the same shall adopt such amendments the same shall become a part of the Constitution. When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately."

Nothing in the Constitution specifies how a proposed amendment to the Constitution, that is submitted pursuant to that section, shall be submitted, except that electors are to be given extensive notice thereof by publication and enabled to vote on that amendment separately.

Because such an amendment will have been approved by

three-fifths of the members elected to each House of the General Assembly, it was apparently considered unnecessary to provide and distribute to each elector a printed copy of the proposed amendment, with arguments and explanations for and against it, as required in Section 1g of Article II of the Constitution with respect to an amendment proposed by initiative petition.

In Amended Substitute House Joint Resolution No. 22, the General Assembly did state that "this proposed amendment * * * shall be placed on the official ballot in the manner prescribed by law in essentially the * * * form" therein specified.

It has been stipulated (Stip. 7) that the "Secretary of State * * * prepared the ballot title or statement to be placed on the ballot." This was apparently done pursuant to the part of Section 3505.06, Revised Code, which reads:

"The questions and issues ballot need not contain the full text of the proposal to be voted upon. A condensed text that will properly describe the question, issue, or amendment shall be used as prepared and certified by the Secretary of State for state-wide questions or issues * * *. If such condensed text is used, the full text of the proposed question, issue, or amendment together with the percentage of affirmative votes necessary for passage as required by law shall be posted in each polling place in some spot that is easily accessible to the voters."

This language was adopted after and represents a codification of our decision in *Prosen* v. *Duffy* (1949), 152 Ohio St. 139, 87 N. E. 2d 342. See also the prior cases of *Reutener* v. *Cleveland, supra* (107 Ohio St. 117), and *Thrailkill* v. *Smith, Secy. of State* (1922), 106 Ohio St. 1, 138 N. E. 532.

Since the "text * * * prepared * * * by the Secretary of State" is the same as that specified by the General Assembly in Amended Substitute House Joint Resolution No. 22, we are not confronted with the question as to whether the power conferred upon the General Assembly by Section 1 of Article XVI of the Constitution includes the power to prescribe how the ballot shall describe an amendment proposed thereunder.

This court has been previously presented with contentions that a condensed text did not "properly describe" a proposed constitutional amendment. What was said in considering those

contentions should be helpful in guiding our consideration of that contention in the instant case.

In *State, ex rel. Commissioners of Sinking Fund,* v. *Brown, Secy. of State* (1957), 167 Ohio St. 71, 146 N. E. 2d 287, it is stated in the *per curiam* opinion:

"* * * the possibility of misunderstanding seems remote especially when it is remembered that the *full* text of the amendment was published in at least one newspaper in each county once a week for five consecutive weeks preceding the election, and that the *full* text was duly posted in every polling place. Of course a greater degree of accuracy of expression would have resulted if the ballot had contained the lengthy involved technical terms of the entire amendment, but this is the very difficulty sought to be avoided by the statute which expressly states that the 'ballot need not contain the full text of the proposal' and that a 'condensed text' may be substituted therefor. In criticizing the precis prepared by the respondent Secretary of State, it might be well to recall the wise observation of the noted historian, George Bancroft, in the preface to the last revision of his History of the United States, that 'there is no end to the difficulty in choosing language which will awaken in the reader the very same thought that was in the mind of the writer.' "

In distinguishing the case of *Beck* v. *Cincinnati* (1955), 162 Ohio St. 473, 124 N. E. 2d 120, the court, in the *Sinking Fund case,* said:

"* * * The statement there disapproved was mere unauthorized speculation and coersive argumentation."

There is no such speculation or argumentation in the condensed text involved in the instant case.

In *Thrailkill* v. *Smith, Secy. of State, supra* (106 Ohio St. 1), it is stated in the opinion, at page 9:

"* * * the time afforded for marking ballots after the voter enters the booth does not permit a study of the printed matter on the ballot * * *. All study of the subject must necessarily end before the voter enters the booth * * *."

It was probably for the foregoing reason that the General Assembly, in 1954, amended Section 3505.06, Revised Code, by adding thereto the following paragraph:

"Each question and issue appearing on the questions and

issues ballot may be consecutively numbered. The question or issue determined to appear at the top of the ballot may be designated on the face thereof by the arabic numeral '1' and all questions and issues placed below on the ballot shall be consecutively numbered. Such numeral shall be placed below the heavy top horizontal line enclosing such question or issue and to the left of the brief title thereof.''

Pursuant to this statute, the Ohio Bond Commission amendment has been ''designated'' and will appear on the ballot as ''Issue No. 1.'' As stated in paragraph three of the syllabus of *Thrailkill* v. *Smith, supra* (106 Ohio St. 1), that was quoted with approval in *State, ex rel. Commissioners of Sinking Fund.* v. *Brown, Secy. of State, supra* (167 Ohio St. 71), at 74:

''It is one of the purposes of that statute to prevent each proposal on such ballot from becoming confused in the mind of the voter with other proposals concurrently submitted. Neither the letter nor the spirit of the Code provision requires that the title, or text, or a true copy of the proposed amendment, be printed on the ballot.''

In objecting to the ''condensed text,'' it is argued that it is too long. It does contain 880 words but the area required to reproduce it is less than one-third of the area required to reproduce what it describes. It is then argued that it omits too much, *i. e.*, it is too short.

We do not believe that any useful purpose would be served by expanding this opinion with a detailed analysis of the proposed amendment and the 880-word description complained of. Although each of the members of this court might have used different, and more or less, words to describe the complicated and involved language used in the proposed amendment, we are of the opinion that the ''condensed text'' that will appear on the ballot will ''properly describe'' that amendment.

Furthermore, it is apparent that no elector who listens or reads will be unaware that Issue No. 1 is the Ohio Bond Commission amendment and that it is a highly controversial issue. Such elector should have an opportunity to read its complicated language in its entirety in a local newspaper once a week for five weeks before the election. He should also have an opportunity to read it where it is posted at his polling place. He

can hardly escape hearing or reading the arguments for and against the amendment.

Hence, in our opinion, neither the length of the condensed text nor any omissions therefrom are likely to mislead those who vote at the May 2 election.[3]

As stated in the unanimous *per curiam* opinion in *Moore* v. *Thompson* (1954), 161 Ohio St. 339, 119 N. E. 2d 283:

" 'Strictly speaking, all provisions of the election laws are mandatory in the sense that they impose the duty of obedience upon those who come within their purview, but irregularities, which were not caused by fraud and which have not interfered with a full and fair expression of the voters' choice, should not effect a disenfranchisement of the voters.' "

There is nothing to indicate that any of the statements in or omissions from the "condensed text," that are being complained about, were caused by fraud; and there is nothing now to indicate that they will interfere with a full and fair expression of the voters' choice. In such an instance, they should not prevent submission of Issue No. 1 to the voters.

The question to be decided by us is not whether the amend-

---

[3]In *Cooney* v. *Foote* (1914), 142 Ga. 647, 83 S. E. 537, the Supreme Court of Georgia, in passing upon constitutional provisions similar to the Ohio ones involved herein, stated, at 654:

"* * * Article 13 of the Constitution did not prescribe the details relating to the manner of submission, but left them to the wisdom of the Legislature. It did provide for the publication of the proposed amendment, as a means of giving wide and extensive information of the exact nature of the proposed change or addition. It was never contemplated that the entire proposed amendment should be printed on the ballot. It was within legislative discretion to adopt some formula by which the voter would express his assent or dissent to the proposed amendment. The formula described by the Legislature was not intended for the purpose of informing the voter as to the full contents of the amendment. On the contrary, the formula was intended as the declaration by the voter of his approval or disapproval of the amendment which had been published in each congressional district. The amendment was submitted to the elector, and the formula prescribed was simply to elicit his expression as to whether or not the proposed amendment should become a part of the organic law. The formula written or printed on his ballot was but the legislative means of obtaining his expression upon the published proposal; and when he adopted the formula he indicated his vote upon the whole amendment which was submitted, and not a mere part."

ment proposed by Amended Substitute House Joint Resolution No. 22 should become a part of the Constitution. That was a question for each member of the 107th General Assembly to consider before he voted for submission of that proposed amendment, and it will be a question presented to each of us as an elector at the May 2 primary. As judges, the question that we have to decide is whether the Constitution requires that that amendment be submitted to the electors at a special election on May 2, 1967, as three-fifths of the members of each house of the General Asembly specified in Amended Substitute House Joint Resolution No. 22.

For the reasons hereinbefore stated, we conclude that the Constitution requires that Issue No. 1 be submitted at a special election on May 2.

*Writ denied.*

HERBERT, SCHNEIDER and BROWN, JJ., concur.
ZIMMERMAN, MATTHIAS and O'NEILL, JJ., dissent.

SCHNEIDER, J., concurring. Were it not for the fact that no election would be held on May 2, 1967, in the great majority of the polling precincts of the state but for the submission of the two proposed constitutional amendments, I would have preferred to hold it at this late date (Amended Substitute House Joint Resolution 22 [submitting Issue No. 1] was finally passed by the House of Representatives on March 1, 1967. This action was not filed until April 5, 1967, and not then until after numerous similar actions, which had been filed in various Courts of Common Pleas throughout the state commencing as early as March 18, 1967, were stayed by a writ of prohibition [*State, ex rel. Saxbe, Atty. Genl., v. Petree et al., Judges*, April 4, 1967] issuing from this Court) as to *all* of the issues raised herein that the case of *State, ex rel. Shriver, County Engr., v. Hayes*, 148 Ohio St. 681, is controlling, and, as stated in the second paragraph of the syllabus thereof, "[a]n election contest is the specific remedy provided by statute for the correction of all

errors, frauds and mistakes which may occur in an election." That rule was reaffirmed by six of the then members of this court in *State, ex rel. Commissioners of Sinking Fund,* v. *Brown, Secy. of State,* 167 Ohio St. 71.

However, I concur with the Chief Justice in denying the writ for the reasons stated by him as to the propriety of the election and of the form of the proposed amendment to Article VIII *as containing one amendment.*

O'NEILL, J., dissenting. The first question presented is whether the proposed constitutional amendment can lawfully be submitted to the electors of the state at large for their approval or rejection at a special election on the first Tuesday after the first Monday in May 1967.

The Constitution of the state of Ohio provides in Section 1, Article XVI, as follows:

"Either branch of the General Assembly may propose amendments to this Constitution; and, if the same shall be agreed to by three-fifths of the members elected to each House, such proposed amendments shall be entered on the journals, with the yeas and nays, and shall be submitted to the electors, for their approval or rejection, on a separate ballot without party designation of any kind, *at either a special or a general election as the General Assembly may prescribe. * * *"* (Emphasis added.)

The language, "at either a special or a general election *as the General Asembly may prescribe,"* authorizes the General Assembly to make a choice. The respondent argues that this language does not require the General Assembly to choose *to prescribe by law.* We do not reach that question. Certainly this language authorizes the General Asembly *to prescribe by law* if it chooses to do so. The General Assembly has chosen *to prescribe by law.* It made this choice, first in 1915, just three years after the language quoted above was adopted in 1912 as a part of Section 1, Article XVI of the Ohio Constitution.

Section 5123-1, General Code (106 Ohio Laws 479), enacted in 1915, effective September 3, 1915, provided as follows:

"Whenever any amendments to the Constitution are pro-

posed to be submitted to the people, said amendments shall be submitted at the regular election to be held on the first Tuesday after the first Monday of November of the same year * * *.''

That was the law of Ohio until 1919.

That section was amended in 1919 (108 Ohio Laws, Pt. 1, 693) and, as amended, became law without the Governor's signature. Section 5123-1, as amended, provided:

''Amendments to the Constitution which have been or may hereafter be proposed to be submitted to the electors, may be submitted at any regular election or at a special election, as prescribed by the General Assembly in the resolution proposing such amendment * * *.''

That remained the law of Ohio from 1919 until 1930, when Section 5123-1 was repealed as a part of a general revision of election laws, and Section 4785-4, General Code (now Section 3501.02, Revised Code), was enacted. (113 Ohio Laws 307, 309.)

Section 3501.02, Revised Code, provides:

''*General elections of the state and its political subdivisions shall be held as follows*:

''(A) For the election of electors of President and Vice-President of the United States, in the year 1932 and every four years thereafter;

''(B) For the election of a member of the Senate of the United States, in the years 1932 and 1934, and every six years after each of such years; except as otherwise provided for filling vacancies;

''(C) For the election of Representatives in the Congress of the United States and of elective state and county officers, in the even-numbered years; except as otherwise provided for filling vacancies;

''(D) For municipal and township officers, members of boards of education, members of the State Board of Education, judges and clerks of police and Municipal Courts, in the odd-numbered years;

''(E) *Proposed constitutional amendments* or proposed measures *submitted by the General Assembly* or by initiative or referendum petitions *to the voters of the state at large may be*

*submitted at the general elections in any year* occurring at least sixty days, in case of a referendum, and ninety days, in the case of an initiated measure, subsequent to the filing of the petitions therefor. Unless provision is made by law or charter for the submission of a question or issue to the voters of a county, township, city, village, or school district at a special election, no special election shall be called, and the question or issue shall be submitted· at a general election." (Emphasis added.)

The language of Section 3501.02, which is pertinent and controlling in the case now before the court, reads as follows:

*"General elections of the state and its political subdivisions shall be held as follows:*

*" ( \* \* \**

*" (E) Proposed constitutional amendments \* \* \* submitted by the General Assembly \* \* \* to the voters of the state at large may be submitted at the general elections in any year \* \* \*."* (Emphasis added.)

The first sentence of Section 3501.02, Revised Code, is mandatory in its provision that "general elections of the state and its political subdivisions shall be held as follows: \* \* \*."

An examination of paragraphs (A), (B), (C), (D) and (E), which follow that first sentence, reveals a pattern. Paragraphs (A), (B), (C) and (D) designate the offices to which the general election requirement applies, name the political entity, *i. e.,* state or local political subdivision in which such designated offices are to be filled by election, and designate the year when the required general election for these designated offices is to be held.

· Paragraph (E) follows that pattern. It identifies the questions and issues to which the *general election requirement* applies, names the entity—state or political subdivision in which the named questions and issues are to be submitted—and designates the year when the required general election is to be held. The first sentence of paragraph (E) designates the questions and issues to which the general election requirement applies as *"proposed constitutional amendments* or proposed measures *submitted by the General Assembly* or by initiative or referen-

dum petitions''; designates the entity as ''*to the voters of the state at large*''; and, *as to the year when the required general election is to be held, provides that those named questions and issues ''may be submitted at the general election in any year.''* (Emphasis added.)

The second sentence of paragraph (E) is concerned with the submission of questions and issues in certain named *local* political subdivisions. It follows the pattern and supports the purpose of the entire section, and provides that ''unless provision is made by law or charter for the submission of a question or issue to the voters * * * no special election shall be called, and the question or issue shall be submitted at a general election.''

It has been contended that the language of the first sentence of Section 3501.02(E) is permissive, and that, therefore, the statute is not controlling in this case. That contention ignores the clear purpose of Section 3501.02, taken as a whole. The section begins: ''General elections * * * shall be held as follows * * *.'' These mandatory words introduce and apply to paragraph (E) as well as the other paragraphs of Section 3501.02. The primary purpose of these mandatory words, and of the whole section, is clearly to establish the years in which *general elections shall be held* for the various offices and questions and issues set forth. The words, ''may be held,'' in paragraph (E) do not change the mandatory requirement that *general elections shall be held* on constitutional amendments proposed by the General Assembly to be submitted to the voters of the state at large. Those words are merely permissive as to the frequency of holding the required general elections, which is made clear by the very next words of the statute, ''in any year.'' To have used the words, ''shall be held,'' in conjunction with the words, ''in any year,'' would have created an apparent contradiction between the mandatory connotation of ''shall be held'' and the permissive connotation of ''in any year.''

This court can only determine the meaning of a statute from the language actually used; further argument about why the General Assembly did not use different language is mere speculation.

While it would no doubt have been possible to phrase paragraph (E) differently, it is nevertheless reasonably clear from the purpose and pattern of the statute and the language actually used that Section 3501.02 requires that general elections *shall be held* on state-wide questions and issues when such are proposed, and that such general elections may be held in any year such questions and issues are proposed.

"General election" is defined in Section 3501.01, Revised Code, paragraph (A), as follows:

"General election means any election held on the first Tuesday after the first Monday in November."

Obviously the special election here in question, which is proposed to be held on the first Tuesday after the first Monday in May, is not a general election as required by Sections 3501.01 and 3501.02, Revised Code.

Section 3501.02 is controlling as to the question now before this court unless the pertinent provisions of that section are unconstitutional. The respondent has not claimed that this section is unconstitutional and there is no tenable ground upon which it can be asserted to be unconstitutional. Section 1, Article XVI of the Constitution, expressly authorizes the General Assembly to prescribe a special or a general election and the General Assembly has chosen to prescribe a general election by law.

The proponents of the proposed amendment apparently were of the opinion that the enactment of a law was necessary in order to call a special election for the submission of a proposed constitutional amendment to the voters, because a bill, House Bill 113, was introduced in the General Assembly to provide for such a special election. This bill was passed. However, the respondent concedes that this enactment is ineffective because there was no separate roll call in the House of Representatives upon the emergency clause as required by Section 1d, Article II of the Ohio Constitution.

The respondent now relies upon Amended Substitute House Joint Resolution No. 22 which was amended to call for a special election for the submission of this proposed constitutional amendment on the first Tuesday after the first Monday in May

1967. It is axiomatic that a joint resolution cannot repeal, amend or make inapplicable a law. *State, ex rel. Attorney General,* v. *Kinney, Secy. of State* (1897), 56 Ohio St. 721, 47 N. E. 569. At page 724 in the *per curiam* opinion in that case, the law is stated:

"The statute law of the state can neither be repealed nor amended by a joint resolution of the General Assembly."

That was an election case. It involved an attempt by the General Assembly, by the adoption of a joint resolution, to place on the ballot, for the approval or rejection by the electors of the state, the question of calling a state convention to revise, amend or change the Constitution of the state. Certain provisions of the resolution were contrary to the provisions of the election law. The court held the entire resolution invalid on the ground that a joint resolution could not repeal or amend the provisions of the election law.

Respondent's position on this question is asserted at page 14 of his brief in the following language:

"In summary, then, it is earnestly submitted that Section 3501.02, Revised Code, can have no application to the case at bar. Just as one council cannot bind future councils in the exercise of the 'sovereign powers' of city councils, *Beck* v. *City of Cincinnati,* 162 Ohio St. 473, 475 (1955), one General Assembly cannot restrict a future General Assembly to only the selection of a general election for the submission of proposed constitutional amendments pursuant to Article XVI, Section 1."

That is simply not the law.

The statement in the opinion in *Beck, supra,* is not in point. The question in that case was whether language which appeared in the caption of a ballot, "If levy passes, there will be no city income tax in 1955 or 1956," could bind a future municipal council to that promise. That language was not in any ordinance or in any law. The court held that the council could not make a promise which would bind a future council not to levy an income tax. That is sound law.

It is sound law that one General Assembly cannot make a binding promise that the next General Asembly will not change the law. However, the question before this court does not deal

with a promise not to change the law, but rather the question is whether a law is binding upon a General Assembly until it is changed. The answer is that in a government of laws, not of men, the General Assembly itself must obey the law as any citizen must, until the law is changed by constitutionally authorized means.

It is clear that the General Assembly can amend or repeal a law at any time, but it cannot amend or repeal or make inapplicable a law by the adoption of a joint resolution. *State, ex rel. Attorney General, v. Kinney, Secy. of State, supra* (56 Ohio St. 721); *Cleveland Terminal & Valley Rd. Co. v. State, ex rel.* (1912), 85 Ohio St. 251, 294. Cf. *Cleveland, S. & C. Ry. v. Norwalk* (1915), 17 N. P. (N. S.) 580, affirmed 22 C. C. (N. S.) 590, motion to certify overruled, 60 W. L. B. 144.

The respondent cites no other authority for his position.

It has never been questioned that a law cannot be changed by a resolution of the General Assembly. If it could, the veto power of the Governor would be frequently circumvented without meeting the requirements of Section 16, Article II of the Ohio Constitution.

The General Assembly chose to prescribe by law (Section 3501.02, Revised Code) that proposed constitutional amendments shall be submitted to the voters of the state at large at general elections in any year and this cannot be changed by the incorporation of contrary language in a joint resolution adopted by the General Assembly.

Section 3501.02, Revised Code, is constitutional and is controlling as to the question now before this court.

Therefore, the proposed constitutional amendment cannot lawfully be submitted to the electors of the state at large for their approval or disapproval at a special election on the first Tuesday after the first Monday in May 1967 because to do so is contrary to the provisions of law expressed in Sections 3501.01 and 3501.02, Revised Code.

The writ prayed for should be allowed.

The second question presented is whether the provisions of the proposal contained in Amended Substitute House Joint Resolution No. 22 actually constitute more than one amendment

to the Constitution, contrary to the provisions of Section 1, Article XVI of the Constitution of Ohio.

Section 1, Article XVI, provides:

"* * * When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately."

The purpose of this provision is to permit each amendment to be judged upon its own merit. To allow several unrelated proposals to be labeled as one amendment, with the opportunity to vote only yea or nay on the package, makes it impossible for the voter to cast his yes or no on the basis of his judgment on the merit of each proposal.

In 1912, when the Constitutional Convention proposed several amendments to the Ohio Constitution of 1851, the Convention provided, with regard to the submission of the proposals to the voters, that "the several proposals duly passed by this Convention shall be submitted to the electors as separate amendments to the Constitution * * *." 2 Ohio Constitutional Convention (1912), Proceedings and Debates, 2111.

This court announced the controlling law on this question in *State, ex rel. Burton, Pros. Atty.,* v. *Greater Portsmouth Growth Corp.* (decided June 22, 1966), 7 Ohio St. 2d 34, 218 N. E. 2d 446. In that case, in a unanimous *per curiam* opinion, this court stated, at page 36:

"This section is directed to those instances where two or more different objects are sought to be accomplished in a single proposal. *The singleness of purpose or object sought to be accomplished by the amendment is the test as to whether it complies with such section.*

"Thus, where an amendment to the Constitution relates to a single purpose or object and all else contained therein is incidental and reasonably necessary to effectuate the purpose of the amendment, such amendment is not violative of the provisions of Section 1, Article XVI. *State, ex rel. Hudd,* v. *Timme, Secy. of State,* 54 Wis. 318, 11 N. W. 785; *Lobaugh* v. *Cook, Clerk,* 127 Iowa 181, 102 N. W. 1121." (Emphasis added.)

Respondent agrees, in his brief at page 23, that "the constitutional requirement of the submission of one amendment at a

time is to permit the voters to cast a yes or no on one subject.''

He concedes that a proposal containing totally unrelated subject matter is proscribed.

This brings the court squarely to the question of whether the proposal submitted in Amended Substitute House Joint Resolution 22 contains but a single purpose or object sought to be accomplished by the amendment to the Constitution.

Compelling evidence that the proposal contains more than a single purpose, subject or object and that which is incidental and reasonably necessary to effectuate the purpose of such amendment is contained in the last four lines of the text which appears on the ballot, which reads: ''and excluding the application of Sections 1, 3, 5, 7 and 13 and parts of Sections 4 and 6 of Article VIII'' of the Constitution.

The respondent takes the position that the single subject is the creation of new and additional public debt for public purposes.

The broad subject of public debt for a public purpose is not a sufficiently defined subject to permit a voter to cast a yes or no vote on one subject, purpose or object. A voter is in a position to decide to vote no if he is against the creation of any new public debt for a public purpose. However, unless he is against the creation of any new public debt for a public purpose, he cannot determine whether he wants to vote yes or no on the issue until he is informed as to the specific purpose for which the public debt is proposed to be created, and the amount of the proposed debt.

An examination and careful study of the proposal before the court indicate that there are at least four major purposes or objects or subjects contained in its language. They can be succinctly stated as follows:

1. The creation of a new commission with power to create new public debt by pledging the faith and credit of the state without a vote of the people, to be repaid from taxes, for the purpose of making capital improvements which involve both acquisition of land and buildings and construction of new buildings and facilities;

2. The granting of new power to this new commission to

spend the proceeds raised by the sale of bonds or obligations without appropriation by the General Assembly, which appropriation is required under existing bond amendments, and without being subject to veto by the Governor, which veto power exists under present bond amendments, and with the constitutional power to enter into contracts for construction of public highways, university buildings and all other public improvements, and to supervise such construction;

3. To create additional debt by issuing revenue bonds to be repaid from rentals and revenues derived from capital improvements constructed with the proceeds of such bonds, and to maintain and operate and charge fees and rentals for such facilities;

4. To use state funds secured from the sale of bonds and other obligations to pay the local real estate taxes of persons by means of interest-free loans to such persons, secured by a state lien on their residential property, which lien is mandated by the proposed amendment.

It does not seem reasonable that a citizen should be asked to vote on a proposal containing four such sweeping, diverse and unrelated proposals, and be faced with a single choice that requires the voter to vote yes for all four of them, or no against all four of them.

The basic reason for the requirement that the voter be afforded the opportunity to vote yes or no on a "single amendment" with a single over-all object or purpose is clearly demonstrated by this proposal.

Certainly one of the evils that is guarded against by the provision in Section 1 of Article XVI of the Constitution is the temptation to the proponents of a proposed constitutional amendment to include within such proposal other proposals that will be attractive to a large segment of the electorate who will then be faced with the necessity of voting in favor of all proposals in order to cast a favorable vote for that one which they support because it is of special benefit to them.

This goes to the very heart of the importance of creating the opportunity for voters to make a clear and responsible choice when important and complex issues of government are to be decided by popular vote in a state-wide election.

No reasonable person can conclude that the different objects and purposes contained in the instant proposal can be said to constitute a single over-all purpose or object or subject and that all else contained therein is incidental and reasonably necessary to effectuate that purpose or object.

Some argue that there is no constitutional restriction with regard to what a proposal for a constitutional amendment may contain and that the General Asembly is free to include in a single amendment as many subjects and objects as it desires, so long as it labels the proposal as one amendment and that such label makes the proposal meet the requirements of Section 1, Article XVI. Such a position can only lead to chaos. For example, a proposal for reapportionment could be combined with the proposal now before this court and labeled as one amendment, offering the voter but one opportunity to cast one yes or one no vote. A proposal calling for large expenditures of money could be combined with another proposal mandating substantial tax decreases and the two proposals could be labeled as one amendment. The constitutional provision in Section 1, Article XVI, was designed to prevent such combinations.

Even if it were to be held that the single purpose or object rule laid down by this court in *State, ex rel. Burton, Pros. Atty.,* v. *Greater Portsmouth Growth Corp., supra* (7 Ohio St. 2d 34), would permit a proposed constitutional amendment to include the first three purposes that this opinion has set forth above, that is, the power to create a state debt, the power to spend the proceeds thereof for capital improvements, and the power to issue revenue bonds, the proceeds of which are to be used for public improvements, one can only conclude that the fourth purpose, that is, of using the proceeds of the bond issue to lend to private citizens to pay their taxes on their residential real estate, is foreign to the purposes and objects of the first three proposals and entirely unrelated, and requires a voter who favors one and not the other to make an impossible choice.

Two such unrelated purposes and objects would not be permitted under the law in a single bill in the General Assembly because the provisions in a bill must be related to the same subject.

164

It is even more important that they not be permitted in a proposed constitutional amendment which is being written into the organic law of the state and which is much more difficult to change than a law enacted by the General Assembly.

Unless the test which this court laid down within the last year in *State, ex rel. Burton, Pros. Atty., v. Greater Portsmouth Growth Corp., supra,* is to be overruled, the diverse multi-purposes which this proposed constitutional amendment contains must be held to be contrary to the requirement in Section 1, Article XVI of the Constitution, which requires that, when more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately.

The proposed amendment is clearly severable into one proposal with regard to the loan to private citizens for the payment of their residential real estate taxes, which loan is to be secured by a lien on their property, and the other proposals which, instead of providing for loans, provide for borrowing money by the state, on the credit of the state, and expending that money for capital improvements.

Unless this court is prepared to take the position that the General Assembly is unrestricted in what it proposes as the subjects, purposes and objects of a constitutional amendment so long as it labels it one amendment, then this court should hold the instant proposal contrary to the constitutional requirement. It is folly to say that a proposed constitutional amendment is valid if its purposes, subjects and objects can be characterized by the terms, "creates public debts for public purposes," or, "levies taxes for a public purpose," or, "authorizes the expenditure of money for a public purpose." These are broad generalities and the proposals which can be included under these topics in one amendment leave the voter with an impossible choice and present the opportunity to cast a proposed amendment in terms which will make it attractive to the voter to vote for that which he is against in order to get for himself that which he wants. This can only lead to the corrupting of the constitutional amending process and to the undermining of constitutional government. It will permit the kind of logrolling

which is occasionally practiced in legislative bodies to be introduced into the process for amending the basic and fundamental law of our state, which is the Constitution. This is the sound reason for the provision in Section 1 of Article XVI, that each amendment shall be presented separately to the electorate for a vote.

It is the highest obligation of this court to support, protect and uphold the Constitution and preserve its amending process and the right of the voter to be put in a position to judge a proposal upon its merit and to cast his yea or nay upon an amendment which contains only a single over-all purpose, subject or object and those incidental and reasonably necessary additional provisions for carrying out that over-all purpose, subject or object.

The proposed constitutional amendment violates Section 1 of Article XVI of the Constitution which requires each proposed constitutional amendment to be so submitted as to enable the electors to vote on each amendment separately. *State, ex rel. Burton, Pros. Atty.,* v. *Greater Portsmouth Growth Corp. supra* (7 Ohio St. 2d 34).

The third question presented is: Does the text which will appear on the ballot *properly describe the amendment?*

The applicable law is stated in Section 3505.06, Revised Code, which provides in pertinent part:

"The questions and issues ballot need not contain the full text of the proposal to be voted upon. A condensed text *that will properly describe the * * * amendment shall be used as prepared and certified by the Secretary of State for state-wide questions or* issues * * *." (Emphasis added.)

It is mandatory under this language that either the full text of the proposed amendment or a *proper* condensed text be used. This court is bound, and should not hesitate, to enforce this statute until it is repealed. In this case the General Assembly included in the joint resolution proposing the amendment a condensed text and provided that "* * * such proposal shall be placed on the official ballot in the manner prescribed by law in essentially the following form: * * *." It is clear that the resolution's specification of the text to be used cannot re-

peal the requirements of the statute, for a resolution cannot repeal a statute.

The Secretary of State certified the condensed text to appear on the ballot in that exact form.

The foundation for the statute is the proposition that *a voter has the right to know what it is that he is being asked to vote upon.* See *State, ex rel. Burton, Pros. Atty.,* v. *Greater Portsmouth Growth Corp., supra* (7 Ohio St. 2d 34), page 37.

As in the case of the requirements of the Uniform Bond Act, it is intended for the protection of the voter and thus, particularly in a suit brought before an election, should be scrupulously observed. *State, ex rel. Bd. of County Commrs. of Hamilton County* v. *Guckenberger, Aud.* (1956) 165 Ohio St. 12, 133 N. E. 2d 323; *Schnoerr* v. *Miller, Clerk* (1965), 2 Ohio St. 2d 121, 206 N. E. 2d 902. See, also, *Mehling* v. *Moorehead* (1938), 133 Ohio St. 395, 14 N. E. 2d 15; *Board of Edn. of Ashville Village School Dis.* v. *Briggs, Aud.* (1926), 114 Ohio St. 415, 151 N. E. 327. Compare *State, ex rel. Duffy, Atty. Genl.,* v. *Sweeney, Secy. of State* (1949), 152 Ohio St. 308, 314, 89 N. E. 2d 641; *Leach* v. *Brown, Secy. of State* (1957), 167 Ohio St. 1, 145 N. E. 2d 525.

Where fundamental law is being made, as in the case of the proposed constitutional amendment before this court, not by representatives of the people but by taking a poll of all the voters with each voter counting equally in the result under the "one man one vote" rule, it is imperative that the voter be provided the opportunity to know what the proposal that he is being asked to vote for or against provides.

This court said in *Schnoerr* v. *Miller, Clerk, supra* (2 Ohio St. 2d 121), page 125:

" * * * In the larger community, in many instances, the only real knowledge a voter obtains on the issue for which he is voting comes when he enters the polling place and reads the description of the proposed issue set forth on the ballot."

The respondent, in his brief, at page 41, takes the position that "this General Assembly provided for a full exposition, condensed from the full text, for the subject matter of Issue No. 1 so that an elector who had never heard of the Ohio Bond Commission or any of the arguments pro or con could assimi-

late the salient features and make a choice upon reading the material on the ballot alone.''

*A text appearing on a ballot describing a constitutional amendment should be fair, honest, clear and complete* and contain the essential and salient features of the amendment. Particularly, nothing printed on or omitted from the officially certified, and to the voter, therefore, presumably accurate, ballot should mislead the voter. Compare *Beck* v. *Cincinnati, supra.* (162 Ohio St. 473), followed in *Alexander* v. *Toledo* (1959), 168 Ohio St. 495, 156 N. E. 2d 315; *State, ex rel. Commrs. of Sinking Fund,* v. *Brown, Secy. of State* (1957), 167 Ohio St. 71 (Taft, J., concurring, 75 and 76; Herbert, J., dissenting, 78 to 80), 146 N. E. 2d 287. That text will often provide the voter with his only chance to obtain knowledge of the proposal. See, also, Herbert, J., dissenting in *State, ex rel. Commr. of Sinking Fund,* v. *Brown, Secy. of State, supra,* at page 80.

The text under consideration consists of a single sentence which is more than 800 words long. Since there are several different proposals affecting several different provisions of the present Constitution as has been noted earlier in this opinion, a single 800-word sentence is a confusing and unclear description per se.

However, in several specific instances this text does not meet the required test of containing the essential and salient features of the amendment.

The most important proposal in this proposed amendment is the creation of an Ohio Bond Commission, with broad, sweeping and, in many instances, exclusive and almost unlimited power to create state debt, spend money and control state construction of highways, university buildings and other public improvements.

It is essential for the voter to know about the organization and membership of this commission. The only words in the text relating to these important matters are ''providing for the organization thereof.'' The text fails to state how many members are to be on this commission; whether they are to be appointed or elected and by whom; what their terms of office are to be; what their constitutional qualifications for this of-

fice are; how and by whom they may be removed from office; how many of them are required to be members of the same political party; and how many votes are required to act for the commission at a meeting.

It is difficult to see how any proper description could fail to mention these important and essential salient facts about the central proposal of the amendment. All these facts could be stated in one short succinct paragraph, if not in one brief sentence. Without any mention of them, the voter may be completely unaware that he is turning over tremendous financial resources and constitutional power to the majority vote of a commission whose members are appointed for nine-year terms, and that such power can be exercised by three members of the same political party, with no other qualifications for office than that they be electors. On these matters of omission alone, the condensed text is fatally defective because *it cannot be said to be a text which properly describes the amendment* without at least some of these matters being covered in the description.

Both the relators and the respondent agree that the most important change in the present Constitution which the proposal makes is the grant of power to the commission to create state debt above the present debt limit without a vote of the people. The text omits to state this fact in plain, simple and understandable language. It fails to state the present debt limit that is being changed, except to refer to it as "Section 1 of said Article." This is meaningless as a description for even the best educated and most intelligent voter. Furthermore, to assert that the involved legal phraseology used in the text apprises the voter of the new debt limits and the power of the commission to contract debts beyond the present limit without a vote of the people is unrealistic. Compare *Board of Edn. of Ashville Village School Dist.* v. *Briggs, Aud., supra* (114 Ohio St. 415); *State, ex rel. Bd. of County Commrs. of Hamilton County,* v. *Guckenberger, Aud., supra* (165 Ohio St. 12).

One of the most important changes made by this proposal, as compared with the bonds which are now being issued under present bond amendments for highways, university and other building programs, is that this proposal provides for automatic

appropriation to the commission of the proceeds of bonds issued. Under previously authorized bond issues for capital improvements in Ohio, the bond issue is authorized directly by the constitutional amendment, but the General Assembly retains the power to control the expenditure of the funds raised by appropriation biennially. The text completely fails to mention that this is changed by the proposal and that the General Assembly (elected, not appointed, officials) will retain no control through the power of appropriation of funds over the timing of construction projects, and the allocation of funds therefor. This fact is omitted from the text entirely.

One of the salient features of this proposal is that the power is given to the commission exclusively to propose to the General Assembly an official program of specific improvements and functions for which bonds are to be issued, upon which the General Assembly is required to act by resolution if it approves. Under present bond amendments for capital improvements, the Governor makes such proposals for capital improvements and use of other bond funds and has the power of veto, which he does not have under the proposed amendment. No reference is made in the ballot text to these essential features of the commission's power, or to the diminution of the Governor's power.

With reference to that part of the amendment which provides for the payment of real estate taxes of a person whose taxes are deferred by interest-free loans, *the text omits to state* that the amendment mandates a lien upon the residential property of that person. Certainly the elderly voter is entitled to know that, to the extent that his taxes are paid for him under the proposal, the state obtains a lien, with its attendant power of foreclosure and sale, upon his home. This is another salient feature of the proposed amendment omitted from the supposedly descriptive text.

Each of the matters mentioned can be stated in a few short clear sentences, in plain and understandable language, using far less words and space than the text uses, and there are other important omissions of which space does not permit mention.

It can be said with fairness and restraint, that no voter,

170

upon reading this text, would even know, let alone understand some of the most important, essential, salient and controversial features of this proposal, and that the best educated and most intelligent voter would be confused and misled by its language, organization and by what it mentions in contrast to what it fails to mention.

This text does not properly describe the proposed amendment as is required by the provisions of Section 3505.06, *supra.* To approve such a description as this is not only unfair and misleading to the voter, but, equally important, it sets a dangerous precedent for the future. It negates the purpose of Section 3505.06, which is to inform the voter, upon the ballot, on the questions upon which he is voting, and, worse, allows positive misinformation upon the ballot itself to be available at the crucial time of actual voting. Thereby, it undermines the very foundation of representative government.

ZIMMERMAN and MATTHIAS, JJ., concur in the foregoing dissenting opinion.