RICHARD L. ANDREWS *v.* GOVERNOR OF
MARYLAND ET AL.

[No. 138, September Term, 1981.]

*Decided September 7, 1982.*

*Motion for reconsideration filed October 7, 1982; denied
October 7, 1982.*

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

Richard L. Andrews, in proper person, appellant.

*Richard E. Israel, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellees.

COLE, J., delivered the opinion of the Court.

The one issue presented by this appeal is whether two proposals for amendments to the Maryland Constitution, drafted by the General Assembly and submitted to the voters for their ratification in the general election of 1980, followed the constitutionally prescribed format for amending the Constitution, when the passage of one amendment was made contingent upon the passage of the other.

The pertinent facts can be recounted succinctly. The General Assembly passed two bills at its 1980 Session proposing to amend the State Constitution. Richard L. Andrews, the appellant here, challenged the proposals as violating Article XIV, § 1 of the Constitution, in that each proposal contained a provision that its passage and adoption was to be contingent on the passage of the other. Andrews filed suit in the Circuit Court for Anne Arundel County, seeking to have the court declare the two proposed amendments invalid and requesting the court to issue an injunction to prevent the placing of the proposals on the November, 1980 ballot.

On October 7, 1980, the Circuit Court granted summary judgment to the defendants in Andrews' suit. Andrews appealed to the Court of Special Appeals, which dismissed the appeal as not being from a final judgment. Andrews thereupon filed a motion with the Circuit Court to render final judgment, which was granted on July 10, 1981. In the meantime, on November 4, 1980, the voters of Maryland approved the proposed constitutional amendments and the Governor of Maryland proclaimed their ratification. Andrews once again appealed the decision of the Circuit

Court to the Court of Special Appeals. We granted certiorari prior to consideration by that court to consider the constitutional question presented.

The amendments whose vitality Andrews challenges were proposed by the General Assembly as Chapters 523 and 524 of the Acts of 1980. Chapter 523 proposed to repeal and amend several sections of Article IV of the Constitution. That portion pertinent to this appeal concerns the restructuring of the court system in the Eighth Judicial Circuit, Baltimore City. Prior to Chapter 523, each of Maryland's twenty-three counties had only one circuit level court for that county. Baltimore City, on the other hand, had three civil common law circuit level courts: The Superior Court, the Court of Common Pleas, and the Baltimore City Court. Md. Const. Art. IV, § 28. *See Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975); *Legum v. Blank,* 105 Md. 126, 65 A. 1071 (1907). Chapter 523 proposed a comprehensive revision of Article IV, repealing Sections 27 through 35 and 37 through 39, and amending Sections 1, 4A, 4B (a), 5, 9, 18, 20, 23, 25, and 26, which resulted, as far as the issue presented here is concerned, in consolidating the various circuit level courts in Baltimore City into one circuit court.[1] The offshoot of this would be to harmonize the Baltimore City court system with the circuit courts systems in the twenty-three Maryland counties. In addition, Chapter 523 provided that it would only be effective if Chapter 524 was adopted by the voters in the same election.

The second proposed amendment, Chapter 524, endeavored to amend Article IV, § 8 of the Constitution. The change pertinent to the instant case concerns the right of removal guaranteed by that article. Prior to Chapter 524, Article IV, § 8 provided that

in all suits or actions at law ... pending in any of

---

1. The courts in the Eighth Judicial Circuit (Baltimore City) to be consolidated as the Circuit Court for Baltimore City under Chapter 523 of the Acts of 1980 are: The Supreme Bench of Baltimore City, the Superior Court of Baltimore City, the Court of Common Pleas, the Baltimore City Court, the Circuit Court of Baltimore City, the Circuit Court No. 2 of Baltimore City and the Criminal Court of Baltimore.

the courts of law in this State, having jurisdiction thereof, upon suggestion in writing under oath of either of the parties to said proceedings, that such party cannot have a fair and impartial trial in the court in which the same may be pending, the said court shall order and direct the record of proceedings in such suit or action, issue, presentment or indictment, to be transmitted to some court having jurisdiction in such case for trial. . . .

This guaranteed to civil law litigants one automatic right of removal to another court of competent jurisdiction. *See Davidson v. Miller, supra; Shreffler v. Morris,* 262 Md. 161, 277 A.2d 62 (1971). Chapter 524 changes this "automatic" right to a discretionary one, providing that

in addition to the suggestion in writing of either of the parties to the cause or case, that the party cannot have a fair and impartial trial in the court in which the cause or case may be pending, it shall be necessary for the party making the suggestion to make it satisfactorily appear to the court that the suggestion is true, or that there is reasonable ground for the same. . . .

Chapter 524 concludes with the same contingency section contained in Chapter 523, *i.e.,* that the provisions of Chapter 524 would only be effective if Chapter 523 was adopted by the voters in the same election.

Andrews contends that by making the efficacy of each of the proposed amendments contingent upon the adoption of the other, the legislature has stepped outside the procedure prescribed by the Constitution for its own amendment. Specifically, he maintains that the contingency provision in each of the bills violates the separate vote requirement of Article XIV, § 1: "[W]hen two or more amendments shall be submitted. . . to the voters of this State at the same election, they shall be so submitted as that each amendment shall be voted on separately."

Andrews thus challenges the validity of the proposals,

even though approved by the electorate and proclaimed by the Governor as valid amendments. Our duty here is clear. We must determine if the legislature has complied with the scheme prescribed in the Constitution for its own amendment, for, as we said in *Hillman v. Stockett,* 183 Md. 641, 648, 39 A.2d 803 (1944).

> Provisions of a constitution regulating its own amendment, otherwise than by a convention, are not merely directory, but are mandatory; and a strict observance of every substantial requirement is essential to the validity of the proposed amendment.

We are equally mindful of the principle of judicial review that when a constitutional amendment has been ratified by the electorate every reasonable presumption in favor of its validity will be indulged in and the party challenging its validity will be saddled with the burden of clearly establishing its constitutional infirmity. *See City of Glendale v. Buchanan,* 195 Colo. 267, 578 P.2d 221, 224 (1978); *Keenan v. Price,* 68 Idaho 423, 195 P.2d 662 (1948); *City of Raton v. Sproule,* 78 N.M. 138, 429 P.2d 336 (1967). The reason for this principle is obvious. The people are presumed to have understood the propositions as submitted and by their approval determined that the amendments are for the public good.

Despite this heavy burden, Andrews, nevertheless, insists that the contingency clause appended to each proposal violates the voter's right to vote separately on each proposal as required in Section I of Art. XIV. The effect of this provision, Andrews maintains, is to remove the element of choice from the voter. If the voter wishes to reject one of the proposals, he must reject both. Otherwise, if he votes "no" on one and "yes" on the other he has effectively nullified his vote. This, Andrews argues, denies the voter his right of choice. If the voter wants to make his vote count, he must vote consistently on both proposals, the net effect of which requires the voter to cast one vote for or against both proposals.

In ascertaining the meaning of a constitutional provision, we are governed by the same rules of interpretation which prevail in relation to a statute. *Perkins v. Eskridge,* 278 Md. 619, 639, 366 A.2d 21 (1976). Thus, we consider the history of the provision, the evils to be remedied, as well as the objects to be attained by its adoption. The standard we have enunciated for this purpose is:

> [C]onstitutions are not to be interpreted according to the words used in particular clauses. The whole must be considered, with a view to ascertain the sense in which the words were employed, and its words must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. . . . It [the Constitution], unlike the Acts of our legislature, owes its whole force and authority to its ratification by the people, and they judged of it by the meaning apparent on its face. . . . [*Manly v. State,* 7 Md. 135, 147 (1854).]

We look, then, to the history and purpose of Article XIV, § 1, as well as the provision as a whole, to determine the scope and applicability of this section to the instant circumstances.

Although the Constitution has changed several times since the original 1776 instrument, there has always been some provision for its amendment. The 1776 Constitution, in § 59, provided that, in order to change the Declaration of Rights or the Constitution, the General Assembly would have to pass a bill, publish it at least three months before a new election, and then confirm the bill after a new election of delegates. Thus, anytime the members of the General Assembly desired to amend the Constitution they were required to submit their positions as legislators to the uncertainties of another election in order to seek the sense of the people on the proposed amendment.

This process was substantially altered by the Constitution of 1864 in Article XI, § 1. That provision required a proposed amendment to receive three-fifths support of the members of both houses. The proposals would then be publicized for at

least three months and submitted to the voters for approval at the next election. If a majority of voters approved then the Governor was to proclaim the amendments. It is in the 1864 Constitution that the restriction first appears that "[w]hen two or more amendments shall be submitted by the General Assembly to the qualified electors of the State at the same election, they shall be so submitted that the electors may vote for or against each amendment separately."

The Constitution of 1867, in Article XIV, § 1, continued the process in substantially the same form as that prescribed in the Constitution of 1864. However, the framers added a short but significant phrase at the beginning: "The General Assembly may propose Amendments to this Constitution; *provided, that each Amendment shall be embraced in a separate Bill, embodying* the Article or Section, . . . ." (Emphasis supplied.) Thus a proposal to amend the Constitution was required to be couched in a separate bill so that the electorate could cast a separate vote.

The next relevant change in Article XIV, § 1 occurred in 1972, with the ratification of Chapter 367 of the Laws of 1972. This amendment became and is the present Article XIV, § 1. In pertinent part it states:

> The General Assembly may propose Amendments to this Constitution; provided that each Amendment shall be embraced in a separate bill, embodying the Article or Section, as the same will stand when amended. . . . The requirement in this section that an amendment proposed by the General Assembly shall be embraced in a separate bill shall not be construed or applied to prevent the General Assembly from (1) proposing in one bill a series of amendments to the Constitution of Maryland for the general purpose of removing or correcting constitutional provisions which are obsolete, inaccurate, invalid, unconstitutional, or duplicative; or (2) embodying in a single Constitutional amendment one or more Articles of the Constitution so long as that Constitutional

amendment embraces only a single subject. . . . When two or more amendments shall be submitted . . . to the voters of this State at the same election, they shall be so submitted as that each amendment shall be voted on separately.

Thus, in 1972 the people ratified an explanation and clarification of the separate bill requirement, limiting it in the case where the proposed amendment seeks to correct a faulty or outmoded document and further defining it to mean that as long as the provisions of the amendment relate to a single subject, it (the amendment) could be proposed in a separate bill.

It is generally agreed that these constitutional provisions are all aimed at preventing the pernicious practice of "logrolling" in the submission of a constitutional amendment. *See, e.g., Carter v. Burson,* 230 Ga. 511, 198 S.E.2d 151, 156 (1973); *Moore v. Shanahan,* 207 Kan. 1, 486 P.2d 506, 516 (1971); *City of Raton v. Sproule,* 78 N.M. 138, 429 P.2d 336, 342 (1967). Logrolling occurs when two or more propositions essentially dissimilar in subject matter are submitted to the electorate in one amendment so that the voter may cast one expression of his vote answer on the measure as a whole. The voter is thus bound in order to secure the enactment of the provision he favors, to vote for others of which he may disapprove. Our constitutional provision is designed to prevent this practice.

The question of whether there has been a violation of the separate vote requirement because of logrolling usually has arisen when there has been one amendment submitted which includes two or more subjects. The courts which have recognized violations of the separate vote requirements have done so because the propositions included in the amendment related to more than one subject and had at least two distinct and separate purposes not dependent upon or connected with each other.

While our research has uncovered no fact situation similar to the case *sub judice, i.e.,* two amendments each contingent on the other's passage, we believe an analysis of the cases

dealing with one amendment containing two or more sub-jects will be of assistance in resolving the issue before us.

The only Maryland case that has construed the constitutional directives in Article XIV, § 1 is *Hillman v. Stockett,* 183 Md. 641, 39 A.2d 803 (1944). In *Hillman* a citizen challenged the so-called Bond Amendment, proposed by Chapter 772 of the Laws of 1943, which sought to amend three sections of and add a new section to Article IV of the Constitution, pertaining to the Judiciary Department. The petitioner contended that such sweeping changes in Article IV amounted to more than one amendment; that two or more amendments were involved but that they were not sub-mitted in separate bills. The Court reasoned that:

It is also a reasonable conclusion that the framers of the Constitution did not intend, if the Legislature desired to change two or more sections, that each section had to be placed in a separate amendment. Article XIV does not say so. The sections of the Constitution are interrelated. Many of them are dependent on others. For instance, in the sections of the judiciary article to be changed by the proposed amendment, Section 14 provides that the Court of Appeals shall be composed of the Chief Judges of the first seven of the several judicial circuits of the State, etc. To find out how these Chief Judges are named, it is necessary to look at Section 21. If the Legislature desired, as it did, to submit an amend-ment changing the composition of the Court of Appeals so that it would be composed, not of Chief Judges, but of specially elected Judges from newly created appellate circuits, it was necessary for it, not only to propose an amendment to Section 14, but also to propose an amendment to Section 21. This would, in reality, be only one general change, but if it had to be submitted by two separate proposals, one might be adopted, and the other not, with great consequent confusion and disorganization of the Courts. The Constitutional

> Convention must be presumed to have realized that this was so, since it divided the Constitution into these sections, which, as we have stated, are interrelated.
> What it seems to us was intended, is that the word "amendment" used in Article XIV, § 1, meant a proposal of changes in a particular subject. . . .

The *Hillman* Court recognized that it would be a violation of § 1 to include two or more different and unrelated subjects in one amendment. It did not hold that Article XIV, § 1 prevented the General Assembly from proposing several amendments dealing with the same subject matter for the people's approval at the same election.

A perusal of the Constitutions of our forty-nine sister states has revealed that no fewer than seventeen of those states have a separate vote requirement similar to Maryland's. *See,* Ariz. Const. Art. XXI, § 1; Ark. Const. Art. 19, § 22; Colo. Const. Art. XIX, § 2, Idaho Const. Art. 20, § 2; Ind. Const. Art. XVI, § 2; Iowa Const. Art. 10, § 2; Kan. Const. Art. 14, § 1; Minn. Const. Art. IX, § 1; N.M. Const. Art. XIX, § 1; Ohio Const. Art. XVI, § 1; Okla. Const. Art. XXIV, § 1; Or. Const. Art. XVII, § 1; Pa. Const. Art. XI, § 1; Wash. Const. Art. XXIII, § 1; W. Va. Const. Art. 14, § 2; Wisc. Const. Art. XII, § 1; Wyo. Const. Art. 20, § 2. The cases decided under these provisions address the separate vote requirement as applied to only one amendment, usually challenged on the same ground as that raised in *Hillman*. *See, e.g., Kerby v. Luhrs,* 44 Ariz. 208, 36 P.2d 549 (1934); *Carter v. Burson, supra; Penrod v. Crowley,* 82 Idaho 511, 356 P.2d 73 (1960); *Fugina v. Donovan,* 259 Minn. 35, 104 N.W.2d 911 (1960); *In Re Petition No. 314,* Okla. 625 P.2d 595 (1981); *Baum v. Newbry,* 200 Or. 576, 267 P.2d 220 (1954).

A leading case on this subject and relied on in several other decisions is *Fugina v. Donovan, supra.* In *Fugina* the court considered a contention that one proposed amendment violated Article IX, § 1 of the Minnesota Constitution, to wit: "If two or more amendments are submitted at the same

time, voters shall vote for or against each separately." The proposed amendment would have allowed the legislature to extend the term of any session for not more than 30 days beyond the 90 legislative days and would have permitted legislators to serve as notaries and to seek election to other offices. Regarding the purpose of the separate vote requirement, the court commented that:

> The constitutional mandate that multifarious amendments shall be submitted separately has two great objectives. The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent "logrolling" or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts. [*Fugina v. Donovan, supra,* 104 N.W.2d at 914.]

*In Re Petition No. 314, supra,* is especially instructive since it involves the construction of an Oklahoma constitutional provision that contains a separate bill and a separate vote restriction similar to the Maryland Constitution. The Oklahoma Constitution provides that no proposal for amendment "shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted." Okla. Const. Art. 24, § 1. In that case a proposed amendment was challenged as containing more than one general subject. Construing both the separate subject and separate vote requirements of its constitution at once, the Supreme Court of Oklahoma discussed several of the leading cases around the country on the subject. It concluded that close "examination reveal[ed] that decisions, whether explicitly stated or not, were based upon judgments by the court as to whether the purposes behind the rule were offended by the particular proposals." 625 P.2d at 603. The court referred to the dual purposes referred to in *Fugina* and

concluded that the proposal to change the Oklahoma constitutional restrictions on advertising, franchising, and retailing alcoholic beverages in one amendment both misled the public and constituted logrolling by the legislature and, therefore, struck the proposed amendment involved.

*Hillman, Fugina, and Petition No. 314* cogently illustrate our conclusion that the two restrictions in the Maryland Constitution must be construed together as serving the same objectives and as being directed at the same evils. *Hillman and Petition No. 314* construed both the separate bill and separate vote requirements together, and *Petition No. 314* specifically applied the double purposes of the rule enunciated in *Fugina* to both provisions. As we noted, *Fugina* and the cases referred to which interpreted a separate vote constitutional provision were applying such provision where only one amendment was being challenged. *See, Kerby v. Luhrs, supra* (one amendment proposing to change taxes on copper mines, taxes on public utilities, and establishing a constitutional commission on taxes struck down as subjects were not sufficiently interrelated); *Carter v. Burson, supra,* (one amendment proposing to abolish the constitutional office of State Treasurer and reorganize Executive Department generally upheld as relating to a single subject); *Penrod v. Crowley, supra,* (one amendment proposing to change selection of justices of the peace to an election process, eliminate a maximum jurisdictional amount in cases tried by justices of the peace, and to change the words "called in question" to "in issue" upheld as involving a common object and purpose. Indeed the Supreme Court of Oregon in *Baum v. Newbry, supra,* (construing a separate vote constitutional provision), has held that the separate vote requirement "[a]t most . . . prohibits the submission of two amendments *on two different subjects* in such manner as to make it impossible for the voters to express their will as to each." *Id.* at 223 (emphasis supplied).

As we see it, the single subject and separate vote provisions of Article XIV, Section 1 are constitutional constraints on the legislature when proposing amendments to the Constitution. The provision, viewed as a whole, is intended to

require a single amendment to deal with a single subject which may be ratified or rejected by a single vote. If the proposed changes deal with different or dissimilar subjects and seek to reach different objectives which require amendment, then the legislature must submit these proposals to the electorate so as to allow the electors to vote upon each separately.

However, when two or more amendments dealing with the same subject are so functionally interrelated that they may have been submitted as one amendment, but, for purposes of highlighting their significance and to avoid confusion of the electorate, are set out individually, and when the connection and interdependence of such amendments are emphasized by making the passage of one contingent on the passage of the other to the effect that the proposals constitute a consistent and workable whole then, in such case, we hold that Article XIV, Section 1 requiring a separate vote on each amendment has not been violated. The legislature is entrusted with wide discretion in proposing amendments to the Constitution and when it does so to make obvious possible hidden side effects and to promote public awareness, we think it well within its constitutional prerogative. The Constitution was not intended to curtail such discretion and Article XIV, § 1 does not do so.

A look at the history behind and changes wrought by Chapters 523 and 524 reveals that these proposals are consistent with the holding just announced. Rather than being deceptive they are integrally related and actually alert the voters to consequences of which they were probably unaware. Prior to 1975, the Maryland Constitution, Article IV, § 8, guaranteed to all civil law litigants [2] one automatic right of removal from the court in which the suit was initiated to another court having jurisdiction. It had been the long established practice that the choice of court was left in the discretion of the removing judge. *Middleton v. Morgan,* 263 Md. 154, 282 A.2d 94 (1971); *Marzullo v. Kovens*

---

**2.** Article IV, § 8 of the Constitution does not pertain to equity actions. Olson v. Love, 234 Md. 503, 200 A.2d 66 (1964).

*Furniture Co.,* 253 Md. 274, 252 A.2d 822 (1969). Since, as we pointed out earlier, Baltimore City has a court structure unique with respect to the rest of the State, with three civil common law circuit level courts, this allowed the transferral of a case from one circuit level court in Baltimore City to another circuit level court in the City. *See, Middleton v. Morgan, supra; Weiskittle v. State,* 58 Md. 155, 158 (1882). However, in the rest of the judicial circuits throughout the state, removal necessarily meant that the case would be transferred to another county. This disparity was considered and rectified by *Davidson v. Miller,* 276 Md. 54, 344 A.2d 422 (1975).

In *Davidson* the Court addressed the issue of whether the difference in treatment between removal in Baltimore City and removal in the courts of the rest of the State constituted a violation of the United States Constitution's Fourteenth Amendment Equal Protection Clause. The Court noted that

> [t]he object of removal is to get rid of the influence of local prejudice in the community from which the jury to try the case is to come, and thus, as far as practicable, to secure a fair and impartial trial by jury [*Davidson v. Miller, supra,* 276 Md. at 77 (quoting from *Cooke v. Cooke,* 41 Md. 362, 372 (1875).]

The Court found no rational basis for the distinction between Baltimore City litigants and those in the rest of the State and thus held Article IV, § 8's provision on automatic removal of causes to be unconstitutional.

Following closely on the heels of the *Davidson* decision the Maryland General Assembly enacted Chapter 454 of the Maryland Laws of 1976. Codified in Maryland Code (1974, 1976 Cum. Supp.), as § 6-204 of the Courts and Judicial Proceedings Article, the statute sought to grant all litigants in specified actions an automatic removal to the court of another county. Enacted July 1, 1976, the statute was short-lived, as in September, 1976, this Court found that the statute violated Article IV, § 8 of the Maryland Constitution. *Perkins v. Eskridge,* 278 Md. 619, 366 A.2d 21 (1976).

The essence of the decision in *Perkins v. Eskridge, supra,* was that, although Article IV, § 8 of the Maryland Constitution had been found to violate the Fourteenth Amendment to the United States Constitution, it retained sufficient vitality to prevent the enactment of any statutory provision that would conflict with its provisions. The result was that the automatic right of removal provided for in Article IV, § 8 remained "dormant", *Perkins v. Eskridge, supra,* 278 Md. at 624, and could not be revived "except by initiation of a new constitutional amendment," *Id.* at 653, perforce one that would rectify the inequality affected by the structure of the Baltimore City court system.

During the brief tenure of Courts Article, § 6-204, the Baltimore City courts experienced a bevy of requests for removal and there was no small amount of media attention thereby engendered.[3] In a report contained in the files of the Senate Judicial Proceedings Committee on Senate Bill 785 (ultimately Chapter 524) entitled "The Removal Bill," it was noted that Article IV, § 8

> would automatically be revived by the adoption of a constitutional amendment (such as Senate Bill 784) which, by consolidating the city courts into one circuit court, would remedy the constitutional defect noted in *Davidson.* In short, to consolidate the Baltimore City courts is to necessarily revive the absolute right of removal in civil cases.
>
> In the view of the Administration, history clearly demonstrates that such a result would invite the kind of "outrageous abuse" which occurred in 1976

---

**3.** *See,* The Evening Sun, Sept. 1, 1976, at A. 18; The News American, Sept. 1, 1976, at 1; The Sun, Sept. 3, 1976, at A. 14; Baltimore American, Sept. 4, 1976, at 4; The Afro-American, Sept. 11, 1976, at 1, col. 8. Notably The Evening Sun, Sept. 1, 1976 at A. 18 commented that:

in the last two months petitions seeking automatic removal of 500 cases to county courts have been filed. Prior to July 1, when a change of venue was granted only after the petitioner proved he or she could not get a fair trial, only a few cases were transferred to the counties each year. If these initial 500 requests are the beginning of a pattern, county courts could become choked with city cases and a major realignment of the state's circuit court judiciary might be required.

when the General Assembly attempted, by statute, to restore the absolute right of removal by guaranteeing city litigants a right to remove to a county court. Specifically, in the two months following the effective date of that legislation, 500 petitions for a change of venue were filed, a torrent of removal petitions which purportedly created a devastating backlog of the Baltimore civil court trial dockets. Clearly, efficient judicial administration demands that the courts not be subjected to such devastating whims of litigants; absent a showing of cause, a litigant should not be able to remove a case. In addition, the absolute right of removal was used by some as a means of depriving Baltimore's minority litigants of their opportunity for selecting a jury representative of their standing in that community.

For the foregoing reasons, the Administration is committed to achieving court consolidation in Baltimore City without reviving the absolute right of removal. Thus, we have made the effectiveness of each of these constitutional amendments contingent upon the passage and approval of the other. [Footnotes omitted.]

Very clearly, then, history taught and the General Assembly learned that the consolidation of the Baltimore City court system, while ostensibly affecting only Baltimore City, would, in fact, affect the judicial system throughout the entire state. The cases decided by this Court, principally *Davidson* and *Perkins,* established the connection between the structure of the Baltimore City courts and the right of removal. Moreover, the short but very active life of Courts Article, § 6-204, held the connection up under a spotlight for everyone to see. For this reason, the passage of Chapters 523 and 524 were made contingent, one upon the other.

From what we have just seen, it is obvious that the consolidation of the Baltimore City court system and the removal of causes were, in fact, interlocking concepts and were so functionally interrelated as to present a single subject. Both

provisions concern the same Article of the Constitution. If Chapters 523 and 524 were ratified as a unit, which they were, then the result would be a change in the structure of the Baltimore City court system with only minimal effect on the other jurisdictions in the State. If, however, only Chapter 523 was ratified then the right of removal would be revived, a result not apparent on the face of the amendment, nor one which the legislature could expect that the general public would remain aware, with a concomitant deleterious impact on the rest of the courts in the State. If Chapter 523 was not adopted, then the enactment of Chapter 524 would be meaningless, since the right of removal was dormant, due to its constitutional infirmity.

Changes to the Constitution suggested by the legislature "should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire." *Mundell v. Swedlund,* 58 Idaho, 209, 71 P.2d 434, 443-44 (1937). Chapters 523 and 524, rather than misleading the public or binding disfavored changes with favorable ones, actually protect the voters from a hidden side effect of the proposed consolidation. Accordingly, we hold that Chapters 523 and 524 do not violate Constitution Article XIV, § 1 and, since they have already been adopted by the voters and proclaimed by the Governor, represent valid amendments to the Maryland Constitution.

> *Judgment of the Circuit Court for*
> *Anne Arundel County affirmed.*
> *Richard L. Andrews to pay the costs.*