THE STATE EX REL. WILLKE ET AL. *v.* TAFT, GOVERNOR, ET AL.

[Cite as *State ex rel. Willke v. Taft,*
107 Ohio St.3d 1, 2005-Ohio-5303.]

(No. 2005–1647—Submitted September 23, 2005—Decided October 4, 2005.)

**Per Curiam.**

{¶ 1} This is an action in mandamus and injunction under Section 1, Article XVI of the Ohio Constitution to prevent the submission of a constitutional amendment to Ohio electors.

{¶ 2} In August 2005, the General Assembly adopted Am.Sub.H.J.R. 2 ("H.J.R. 2"), which proposed "to enact Section 2p of Article VIII of the Constitution of the State of Ohio to permit the issuance of general obligation bonds to create and preserve jobs, enhance employment and educational opportunities, and promote economic growth through funding local government public infrastructure capital improvements, research and development, and the development of certain sites and facilities, and to expand state and local government authority regarding economic development."

{¶ 3} At least three-fifths of the members of each house of the General Assembly voted to submit the proposed amendment to Ohio electors at the November 8, 2005 general election. See Section 1, Article XVI, Ohio Constitution ("Either branch of the general assembly may propose amendments to this constitution; and, if the same shall be agreed to by three-fifths of the members elected to each house, such proposed amendments shall be entered on the journals, with the yeas and nays, and shall be filed with the secretary of state at least ninety days before the date of the election at which they are to be submitted to the electors").

{¶ 4} The proposed amendment specifies three development purposes and authorizes the General Assembly to provide for the issuance of general obligation bonds or other state obligations to finance the cost of projects implementing the purposes.

{¶ 5} The development purposes specified in the proposed amendment are public infrastructure capital improvements (the "public-works program"), research and development (the "Third Frontier program"), and business site and facility development (the "business-facilities program"):

{¶ 6} "Section 2p. (A) It is determined and confirmed that the development purposes referred to in this division, and provisions for them, are proper public purposes of the state and local governmental entities and are necessary and appropriate means to create and preserve jobs and enhance employment and educational opportunities; to improve the quality of life and the general economic well-being of all the people and businesses in all areas of this state, including economically disadvantaged businesses and individuals; and to preserve and expand the public capital infrastructure; all to better ensure the public health, safety, and welfare. Those purposes are:

{¶ 7} "(1) Public infrastructure capital improvements, which shall be limited to roads and bridges, waste water treatment systems, water supply systems, solid waste disposal facilities, and storm water and sanitary collection, storage, and treatment facilities, including real property, interests in real property, facilities, and equipment related to or incidental thereto, and shall include, without limitation, the cost of acquisition, construction, reconstruction, expansion, improvement, planning, and equipping;

{¶ 8} "(2) Research and development in support of Ohio industry, commerce, and business (hereinafter referred to as 'research and development purposes'), which shall include, without limitation, research and product innovation, development, and commercialization through efforts by and collaboration among Ohio business and industry, state and local public entities and agencies, public and private education institutions, or research organizations and institutions, all as may be further provided for by state or local law, but excluding purposes provided for in Section 15 of Article VIII, Ohio Constitution; and

{¶ 9} "(3) Development of sites and facilities in Ohio for and in support of industry, commerce, distribution, and research and development purposes."

{¶ 10} Funding for the public-works program by state-issued bonds was first authorized by Ohio electors in 1987. Section 2k, Article VIII, Ohio Constitution. In 1998, the General Assembly codified the public-works program in R.C. Chapter 164. In 1995, Ohio electors renewed the public-works program by passing another statewide bond issue. Section 2m, Article VIII, Ohio Constitution.

{¶ 11} The General Assembly created the Third Frontier program in 2002 by enacting R.C. Chapter 184. See R.C. 184.01(A) ("There is hereby created the third frontier commission in the department of development. The purpose of the commission is to coordinate and administer science and technology programs to

promote the welfare of the people of the state and to maximize the economic growth of the state through expansion of both of the following: (1) The state's high technology research and development capabilities; (2) The state's product and process innovation and commercialization"). In 2003, a Third Frontier statewide bond initiative proposed by 2003 Senate Joint Resolution 3 was rejected by voters.

{¶ 12} In January 2005, the public-works and Third Frontier components of H.J.R. 2 were introduced as separate resolutions in the General Assembly. These components were subsequently joined, and the business-facilities program was added to H.J.R. 2 by June 2005. Certain members of the General Assembly as well as various news media speculated that the reason for submitting the three components together as one proposed amendment was that the Third Frontier portion would have a better chance of passing if it was included with the public-works program than if it were submitted as a separate amendment.

{¶ 13} On September 2, 2005, relators, Dr. John C. Willke and Barbara Willke, state taxpayers and electors, instituted this expedited election action under Section 1, Article XVI of the Ohio Constitution for a writ of mandamus to compel respondents, Governor Bob Taft and Secretary of State J. Kenneth Blackwell, to strike the proposed constitutional amendment from the November 8, 2005 general election ballot or for an injunction preventing the proposed amendment from appearing on the ballot. Respondents answered, and the parties filed evidence and briefs pursuant to the expedited schedule set forth in S.Ct.Prac.R. X(9).

{¶ 14} This cause is now before us for a consideration of the merits.

## Jurisdiction

{¶ 15} Under Section 1, Article XVI of the Ohio Constitution, the Supreme Court of Ohio has "exclusive, original jurisdiction in all cases challenging the adoption or submission of a proposed constitutional amendment to the electors," and "[n]o such case challenging * * * the actions or procedures of the general assembly in adopting and submitting a constitutional amendment shall be filed later than sixty-four days before the election."

{¶ 16} Therefore, because relators' action challenges the submission of the constitutional amendment proposed by H.J.R. 2 to the electors and was filed 64 days or more before the election, we have exclusive, original jurisdiction over relators' claims.

## Laches

{¶ 17} Respondents initially assert that this expedited election case is barred by laches because relators delayed 25 days from the August 8 date that H.J.R. 2 was filed with the Secretary of State before filing this action. It is certainly true

that if relators do not exercise the required diligence in an election-related matter, laches may bar the action. See, e.g., *Campaign to Elect Larry Carver Sheriff v. Campaign to Elect Anthony Stankiewicz Sheriff,* 101 Ohio St.3d 256, 2004-Ohio-812, 804 N.E.2d 419, ¶ 14.

{¶ 18} Generally, however, the application of laches requires some sort of prejudice to the other party. *State ex rel. Ascani v. Stark Cty. Bd. of Elections* (1998), 83 Ohio St.3d 490, 493, 700 N.E.2d 1234. Normally, this prejudice in expedited election cases occurs because relators' delay prejudices respondents by making the case an expedited election case under S.Ct.Prac.R. X(9), which restricts respondents' time to prepare and defend against relators' claims, or impairs boards of elections' ability to prepare, print, and distribute appropriate ballots because of the expiration of the time for providing absentee ballots. See, e.g., *Blankenship v. Blackwell,* 103 Ohio St.3d 567, 2004-Ohio-5596, 817 N.E.2d 382, ¶ 27; *State ex rel. Newell v. Tuscarawas Cty. Bd. of Elections* (2001), 93 Ohio St.3d 592, 596, 757 N.E.2d 1135; R.C. 3509.01.

{¶ 19} But unlike respondents in those cases, respondents here assert no specific prejudice in their laches argument. Even if relators had delayed only seven days after passage of the resolution to file this case, it would have been governed by the accelerated schedule for expedited election cases under S.Ct. Prac.R. X(9). And the schedule for evidence and briefs was completed before the passage of the absentee-ballot deadline. See *State ex rel. Steele v. Morrissey,* 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 14.

{¶ 20} Therefore, laches does not bar this expedited election case.

### Relief Against the Governor

{¶ 21} Relators request mandamus and injunctive relief against both the Governor and the Secretary of State relating to the submission of H.J.R. 2 to the electors on the November 8 ballot. The Secretary of State has certain duties concerning the placement of proposed constitutional amendments on the ballot. See Section 1, Article XVI, Ohio Constitution; R.C. 3501.04 and 3501.05; see, also, *State ex rel. Roahrig v. Brown* (1972), 30 Ohio St.2d 82, 85, 59 O.O.2d 104, 282 N.E.2d 584.

{¶ 22} But relators cite no constitutional or statutory provision imposing any duty upon the Governor concerning the placement of constitutional amendments on election ballots. "In mandamus proceedings, the creation of the legal duty that a relator seeks to enforce is the distinct function of the legislative branch of government, and courts are not authorized to create the legal duty enforceable in mandamus." *State ex rel. Lecklider v. School Emp. Retirement Sys.,* 104 Ohio St.3d 271, 2004-Ohio-6586, 819 N.E.2d 289, ¶ 23.

{¶ 23} Based on the foregoing, relators are not entitled to the requested relief against the Governor. Accordingly, we dismiss the Governor from this action, and we limit our consideration of relators' claims to their applicability to the Secretary of State.

## Separate–Vote Requirement

{¶ 24} Relators claim entitlement to a writ of mandamus or an injunction preventing the submission of H.J.R. 2 to the electorate at the November 8, 2005 election because H.J.R. 2 violates the separate-vote requirement of Section 1, Article XVI of the Ohio Constitution.

{¶ 25} Section 1, Article XVI specifies this requirement as follows:

{¶ 26} "When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately."

{¶ 27} The purposes of the separate-vote requirement are to prevent deception of the electorate and logrolling:

{¶ 28} " 'The constitutional mandate that multifarious amendments shall be submitted separately has two great objectives. The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent "logrolling" or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts.' " *Andrews v. Governor* (1982), 294 Md. 285, 295, 449 A.2d 1144, quoting *Fugina v. Donovan* (1960), 259 Minn. 35, 38, 104 N.W.2d 911, construing similar separate-vote requirements in the Maryland and Minnesota Constitutions.

{¶ 29} The separate-vote requirement of Section 1, Article XVI is comparable, but not identical, to the one-subject rule of Section 15(D), Article II ("No bill shall contain more than one subject"). One of the purposes of the one-subject rule is also to prevent logrolling. See *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 142, 11 OBR 436, 464 N.E.2d 153 ("The primary and universally recognized purpose of [one-subject] provisions is to prevent logrolling"). These requirements prevent logrolling " 'by disallowing unnatural combinations of provisions in acts.' " *State ex rel. Ohio Civ. Serv. Emp. Assn., AFSCME, Loc. 11, AFL–CIO v. State Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 26, quoting *Dix*, 11 Ohio St.3d at 143, 11 OBR 436, 464 N.E.2d 153.

{¶ 30} Nevertheless, we have recognized that the separate-vote requirement is broader than the one-subject requirement because "there is nothing in the Constitution of Ohio that requires an amendment thereof, proposed by the

General Assembly pursuant to Section 1 of Article XVI, to be confined to one subject, purpose or object." *State ex rel. Foreman v. Brown* (1967), 10 Ohio St.2d 139, 145, 39 O.O.2d 149, 226 N.E.2d 116; *State v. Foster* (1969), 20 Ohio Misc. 257, 259, 49 O.O.2d 460, 251 N.E.2d 5. As we explained in *Foreman*:

{¶ 31} "[A]t the same time that the Constitutional Convention proposed Section 1 of Article XVI, it proposed Section 16 of Article II [now Section 15(D), Article II], which reads in pertinent part:

{¶ 32} " 'No bill shall contain more than one subject * * *.'

{¶ 33} "It is quite obvious therefore that, if those who submitted Section 1 of Article XVI had intended that each amendment to the Constitution proposed by the General Assembly be confined to one subject, object or purpose, they would have so provided as they did in Section 16 of Article II [Section 15(D), Article II]. They did not." 10 Ohio St.2d at 145, 39 O.O.2d 149, 226 N.E.2d 116.

{¶ 34} Accordingly, the applicable test for determining compliance with the separate-vote requirement of Section 1, Article XVI is that "a proposal consists of one amendment to the Constitution only so long as each of its subjects bears some reasonable relationship to a single *general* object or purpose." (Emphasis sic.) *Roahrig*, 30 Ohio St.2d at 84, 59 O.O.2d 104, 282 N.E.2d 584. "Thus, where an amendment to the Constitution relates to a single purpose or object and all else contained therein is incidental and reasonably necessary to effectuate the purpose of the amendment, such amendment is not violative of the provisions of Section 1, Article XVI." *State ex rel. Burton v. Greater Portsmouth Growth Corp.* (1966), 7 Ohio St.2d 34, 36, 36 O.O.2d 19, 218 N.E.2d 446. Courts have generally taken a "liberal [view] in interpreting what such a single general purpose or object may be." See *Foreman*, 10 Ohio St.2d at 146, 39 O.O.2d 149, 226 N.E.2d 116; see, also, cases from other jurisdictions cited at fn. 7.

{¶ 35} In fact, even under the stricter one-subject provision of Section 15(D), Article II, we have afforded the General Assembly " 'great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject.' " *Ohio Civ. Serv. Emp. Assn.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 27, quoting *Dix*, 11 Ohio St.3d at 145, 11 OBR 436, 464 N.E.2d 153. Consequently, "[t]he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics." *Hoover v. Franklin Cty. Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 482 N.E.2d 575. And "[t]o conclude that a bill violates the one-subject rule, a court must determine that the bill includes a disunity of subject matter such that there is 'no discernible practical, rational or legitimate reason for combining the provisions in one act.' "

*Ohio Civ. Serv. Emp. Assn.*, at ¶ 28, quoting *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506 (plurality opinion).

{¶ 36} Similarly, in construing a comparable constitutional mandate that a state legislature shall not "create * * * a debt or debts * * * unless the same shall be authorized by a law for some single object or work distinctly specified therein," the New Jersey Supreme Court noted the deference to be given to the legislature in upholding the constitutionality of an act authorizing the issuance of state bonds for various construction projects, including buildings for the mentally retarded, the incarcerated, the blind and handicapped, and the State Medical Examiner:

{¶ 37} " 'All that is required is that the act should not include legislation so incongruous that it could not, by any fair intendment, be considered germane to one general subject. The subject may be as comprehensive as the legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject, and not several. The connection or relationship of several matters, such as will render them germane to one subject and to each other, can be of various kinds, as, for example, of means to ends, of different subdivisions of the same subject, or that all are designed for the same purpose, or that both are designated by the same term. Neither is it necessary that the connection or relationship should be logical; it is enough that the matters are connected with and related to a single subject, in popular signification.' " *New Jersey Assn. on Corr. v. Lan* (1979), 80 N.J. 199, 215, 403 A.2d 437, quoting *Johnson v. Harrison* (1891), 47 Minn. 575, 578, 50 N.W. 923.

{¶ 38} After applying this deferential test to H.J.R. 2, we find that although the issuance of state bonds for the public-works, Third Frontier, and business-facilities projects may represent different components, they are all reasonably related to the single general purpose of job creation or economic development in Ohio. The General Assembly's combination of these three programs in one amendment—although seemingly the product of a tactical decision—is not so incongruous that it could not, by any reasonable interpretation, be considered germane to the purposes of statewide job creation and economic development.

{¶ 39} In fact, H.J.R. 2 is not much different from the constitutional amendment we upheld in *Foreman*, 10 Ohio St.2d 139, 39 O.O.2d 149, 226 N.E.2d 116, which created a bond commission, but specified the purposes for which money could be raised and used. Similarly, in *Burton*, 7 Ohio St.2d 34, 36 O.O.2d 19, 218 N.E.2d 446, the court held that the proposal to adopt Section 13, Article VIII did not violate the separate-vote requirement—even though it affected several constitutional provisions—because it related to the single, general purpose of allowing the state and governmental subdivisions to give financial assistance to private industry or other governmental units to create new employment within the state. And in *Lan*, 80 N.J. 199, 403 A.2d 437, the New Jersey Supreme Court upheld the constitutionality of an enactment permitting the issuance of bonds for the

construction of disparate building projects as not violating that state's single-object requirement for legislative debt creation.

{¶ 40} Although relators cite cases from certain other jurisdictions espousing a stricter test for the separate-vote requirement, see, e.g., *Armatta v. Kitzhaber* (1998), 327 Or. 250, 959 P.2d 49, and *Cambria v. Soaries* (2001), 169 N.J. 1, 776 A.2d 754, we have not adopted this test, see *Foreman* and *Roahrig*, and the stricter view has been subject to some criticism. See, e.g., Lowenstein, Initiatives and the New Single Subject Rule (2002), 1 Election L.J. 35.

{¶ 41} Furthermore, relators' reliance on extrinsic evidence suggesting logrolling or controversy in the enactment of H.J.R. 2, although admissible, is not dispositive. Cf. *In re Nowak*, 104 Ohio St.3d 466, 2004-Ohio-6777, 820 N.E.2d 335, ¶ 71 ("the one-subject provision does not require evidence of fraud or logrolling beyond the unnatural combinations themselves") and ¶ 72–73 (rejecting test that would look beyond four corners of bill and inquire into legislators' activities or political controversy to ascertain compliance with one-subject rule); *Nichols v. Villarreal* (1996), 113 Ohio App.3d 343, 349, 680 N.E.2d 1259 ("we must determine the intent of the Ohio General Assembly not from the expressions of a single legislator, but from the expression of the legislative body as a whole"); *State ex rel. Miller v. Cuyahoga Cty. Bd. of Elections*, 103 Ohio St.3d 477, 2004-Ohio-5532, 817 N.E.2d 1, ¶ 15 (court need not consider newspaper article submitted in support of claim for writ of mandamus).

{¶ 42} Although the combination of the various projects—as relators contend—may well have been a tactical decision to promote passage of all the projects, it is not such an " 'unnatural combination' " of provisions that its submission to the electorate as one amendment violates the separate-vote requirement of Section 1, Article XVI of the Ohio Constitution. The amendment is also sufficiently clear so as to be understandable and not misleading to the ordinary citizen. Accordingly, there is no basis to withhold the proposed amendment from the ballot. The wisdom of the combination under the single general purpose of economic development in Ohio must thus await the will of the electorate at the November 8 election.

{¶ 43} Based on the foregoing, H.J.R. 2 does not violate the separate-vote requirement of Section 1, Article XVI of the Ohio Constitution, because it relates to the single general object of economic development in Ohio. Accordingly, we dismiss the Governor from this action and deny relators' claims for relief in mandamus and injunction against the Secretary of State.

Judgment accordingly.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

PFEIFER and O'DONNELL, JJ., concur in part and dissent in part.

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 44} I concur in the decision to dismiss Governor Taft from this case. I write separately because I believe that the proposed amendment violates the spirit of Section 1, Article XVI of the Ohio Constitution.

{¶ 45} Section 1, Article XVI of the Ohio Constitution states, "When more than one amendment shall be submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment, separately." Though it does not explicitly state that more than one subject is not allowed, Section 1 implicitly indicates that multiple subjects should not be placed in the same amendment. As this court said in *State ex rel. Roahrig v. Brown* (1972), 30 Ohio St.2d 82, 85, 59 O.O.2d 104, 282 N.E.2d 584, "Section 1, Article XVI of the Constitution is clear and unequivocal in its admonition that only a single general purpose may be included in any one proposed constitutional amendment." At least two great objectives support this constitutional mandate. " 'The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent "logrolling" or the combining of unrelated proposals in order to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts.' " *Andrews v. Governor* (1982), 294 Md. 285, 295, 449 A.2d 1144, quoting *Fugina v. Donovan* (1960), 259 Minn. 35, 38, 104 N.W.2d 911, construing similar separate-vote requirements in the Maryland and Minnesota Constitutions.

{¶ 46} Two components of the amendment, infrastructure capital improvements and development of business sites and facilities, have a common general purpose. They are both related to building and developing infrastructure and facilities to assist in business development. The third component does not share the same purpose; it focuses on cutting-edge research and scientific inquiry. Building bridges, roads, and facilities will undoubtedly create jobs. The research component, however necessary and noble when considering the big picture, has a much more attenuated connection to job growth. I believe its placement in this proposed amendment is a classic example of logrolling. I would require that portion of the current proposed amendment to be separately presented to the voters. Accordingly, I concur in part and dissent in part.

O'DONNELL, J., concurs in the foregoing opinion.

---

David R. Langdon; Alliance Defense Fund and Jeffrey A. Shafer, for relators.

Jim Petro, Attorney General, and Arthur J. Marziale Jr., Senior Deputy Attorney General, for respondents.