[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 480.]

THE STATE EX REL. OSTER ET AL. *v.* LORAIN COUNTY BOARD OF ELECTIONS ET AL.

[Cite as *State ex rel. Oster v. Lorain Cty. Bd. of Elections*, 2001-Ohio-1605.]

*Elections—Applicable qualification date for signers of referendum petitions is date the petition is filed—Signers are qualified electors, when—Circulators need not be registered electors at time they circulate part-petitions—Prohibition—Writ sought to prohibit Lorain County Board of Elections and city of Lorain from proceeding with the November 6, 2001 referendum on Ordinance No. 77-01, which reclassified approximately 202.7 acres of land from residential to residential planned unit development—Writ denied, when.*

(No. 01-1639—Submitted September 28, 2001—Decided October 4, 2001.)

IN PROHIBITION.

––––––––––––––

*Per Curiam.*

{¶ 1} On June 7, 2001, the Council of respondent city of Lorain, Ohio, enacted Ordinance No. 77-01, which reclassified approximately 202.7 acres of land from R-1A "Residential" to R-PUD "Residential Planned Unit Development." Intervening respondent, Committee for the Referendum of Ordinance No. 77-01, Citizens for a Better Lorain ("committee"), circulated a referendum petition requesting that Ordinance No. 77-01 be submitted to Lorain voters at the November 6, 2001 general election.

{¶ 2} Circulators of the petition applied the following procedure, which is the usual and customary manner in which petition signatures are obtained. Circulators approached potential signers and asked if the person was a registered voter. If the person indicated that he or she was a registered voter, the person was

asked to sign the referendum petition, and, if necessary, the person also signed a voter registration card to indicate a change of address for the person's registration. If the person advised the circulator that he or she was not a registered voter, the circulator asked the person if he or she wanted to sign a voter registration application and, if the person did, he or she was then asked to sign the petition. The committee submitted the voter registration applications to respondent Lorain County Board of Elections ("board") before the petition was filed.

{¶ 3} On July 6, 2001, the committee filed the referendum petition with the Lorain City Auditor. The petition consisted of seventy-one part-petitions and two thousand twenty-five unverified signatures. On July 25, 2001, the board certified that the petition contained 1,584 valid signatures, which was more than the 1,562 signatures required to place the referendum on Ordinance No. 77-01 on the November 6 election ballot.

{¶ 4} On August 6, 2001, relators, Thomas and Evelyn Oster, taxpayers and resident electors of Lorain, submitted a written protest challenging the referendum petition and the board's July 25, 2001 determination that the petition contained 1,584 valid signatures. The Osters submitted the protest to both the board and the city auditor. On August 9, the city auditor certified the sufficiency and validity of the referendum petition to the board. The auditor relied upon the board's July 25 determination and concluded that the petition contained 1,584 valid registered-voter signatures.

{¶ 5} In their protest, the Osters challenged the validity of three categories of signatures: (1) the signatures of individuals who signed the petition when they were not registered electors; (2) the signatures on part-petitions circulated by individuals who were not registered electors at the time they circulated them; and (3) the signatures on those part-petitions in which the circulators knew that one or more individuals signing the petition were not registered electors at the time they signed.

2

**{¶ 6}** According to the board's voter registration information, fifty-nine of the individuals whose signatures were challenged by the Osters signed the referendum petition before each person's application for registration and/or change of residence had been deemed satisfactory and eligible by the board. The board's voter registration records further established that fifty-eight of the individuals whose signatures were challenged by the Osters signed the referendum petition before each person's application for registration and/or change of residence had been filed with the board, and forty-four of these individuals were not deemed eligible by the board until after the July 6, 2001 petition-filing date. The board and the city had counted all of these as valid signatures because the registration applications had been filed with the board before the referendum petition was filed with the city auditor.

**{¶ 7}** Of the seventy-one part-petitions, twenty-seven contained signatures of persons who had informed the circulator that they were not registered with the board or had changed their residence since the last time they had voted. These part-petitions contained a total of six hundred eighty-four signatures. Regarding these part-petitions, the circulators knew that these persons' applications for registration and/or change of residence had not been filed with the board when they were allowed to sign the petition, but the circulators believed that each application would be filed with the board prior to the filing of the referendum petition with the city auditor.

**{¶ 8}** Three of the petition circulators were not registered to vote until after they had obtained signatures. Their applications for registration, however, were filed with the board before the petition was filed with the city auditor. The Osters challenged the one hundred and four signatures obtained by these circulators before the circulators were registered electors.

**{¶ 9}** On August 30, 2001, the board held a hearing on the Osters' protest, and at the conclusion of the hearing, the board denied the protest. During the

hearing, the board's deputy director testified that board employees time-stamp registration applications upon their submission to the board, and that the applications are then distributed to employees for processing. At the time that the board received the petition here, they had employees on vacation, so some of the applications were not processed on the same day that they had been received. The board authorized the placement of the referendum of Ordinance No. 77-01 on the Lorain ballot for the November 6, 2001 general election.

{¶ 10} On September 10, 2001, relators filed this action for a writ of prohibition to prevent respondents, Lorain County Board of Elections and the city of Lorain, from proceeding with the November 6 referendum on Ordinance No. 77-01. We granted the committee's motion to intervene as a respondent, and the parties filed evidence and briefs pursuant to the expedited election schedule of S.Ct.Prac.R. X(9).

{¶ 11} This cause is now before the court for a consideration of the merits.

{¶ 12} The Osters seek a writ of prohibition to prevent respondents from submitting the referendum on Lorain Ordinance No. 77-01 to the electorate at the November 6, 2001 general election. "In extraordinary actions like prohibition challenging the quasi-judicial decision of a board of elections, 'the applicable standard is whether the board engaged in fraud or corruption, abused its discretion, or acted in clear disregard of applicable legal provisions.' " *State ex rel. Baur v. Medina Cty. Bd. of Elections* (2000), 90 Ohio St.3d 165, 166, 736 N.E.2d 1, 2, quoting *State ex rel. Crossman Communities of Ohio, Inc. v. Greene Cty. Bd. of Elections* (1999), 87 Ohio St.3d 132, 135-136, 717 N.E.2d 1091, 1095.

{¶ 13} The Osters claim that the board abused its discretion and disregarded applicable law by denying their protest and placing the referendum issue on the November 6, 2001 election ballot. More specifically, the Osters initially assert that the board erroneously counted as valid signatures of persons who were not registered as electors with the board on the date they signed the petition and who

were also not qualified electors on the date the petition was filed with the Lorain City Auditor.

### Qualification Date; Statutory Construction

**{¶ 14}** The Osters claim that under Section 1, Article V of the Ohio Constitution, R.C. 3503.01, and R.C. 3503.06, the fifty-eight signatures of persons who signed the petition before each person's application for registration and/or change of residence had been filed with the board were invalid and should not have been counted as valid by the board.

**{¶ 15}** Under the Ohio Constitution, "[e]very citizen of the United States, of the age of eighteen years, who has been a resident of the state, county, township, or ward, such time as may be provided by law, and has been registered to vote for thirty days, has the qualifications of an elector, and is entitled to vote at all elections." Section 1, Article V; see, also, R.C. 3503.01, which provides comparable qualifications for electors in order to vote in the precinct in which the elector resides.

**{¶ 16}** Neither Section 1, Article V of the Ohio Constitution nor R.C. 3503.01, however, addresses qualifications of persons to sign referendum petitions. In other words, neither of these provisions requires that otherwise qualified persons must be registered to vote for thirty days *before* they are qualified to sign referendum petitions.

**{¶ 17}** The Osters next cite R.C. 3503.06 in support of their contention that these fifty-eight signatures are invalid. R.C. 3503.06 provides that "*[n]o person shall be entitled* to vote at any election, or *to sign* * * * any declaration of candidacy or *any* nominating, initiative, *referendum*, or recall *petition, unless the person is registered as an elector*." (Emphasis added.)

**{¶ 18}** The board and the committee relied on R.C. 3501.38, which specifies:

"*All* declarations of candidacy, nominating petitions, or other *petitions* presented to or filed with the secretary of state or a board of elections or with any other public office for the purpose of becoming a candidate for any nomination or office or for the holding of an election on any issue *shall, in addition to meeting the other specific requirements prescribed in the sections of the Revised Code relating to them, be governed by the following rules:*

"(A) *Only electors qualified to vote on the candidacy or issue which is the subject of the petition shall sign a petition.* Each signer shall be a registered elector pursuant to section 3503.11 of the Revised Code. *The facts of qualification shall be determined as of the date when the petition is filed.*" (Emphasis added.)

{¶ 19} R.C. 3503.06 and 3501.38 are both general provisions relating to qualifications of persons to sign petitions. Contrary to the Osters' claims, R.C. 3503.06 is not one of the "other specific requirements" mentioned in the introductory language in R.C. 3501.38 and additional to the requirements in the latter statute. Instead, from the context of the phrase, these "other specific requirements" are those that relate to the different *types* of election petitions involved, *e.g.*, R.C. 303.12(H) (petitions for referendum on county zoning amendment); 519.12(H) (petitions for referendum on township zoning amendment); 731.28 to 731.41 (petitions for municipal initiative and referendum); 3513.261 (nominating petitions); 3513.07 (declaration of candidacy and petitions of persons desiring to be candidate); 4301.33 (petitions for local liquor option); 4301.333 (petitions for local option election for location of liquor stores within precinct); 4301.334 (petitions for local option election for community facilities).

{¶ 20} Because R.C. 3503.06 is merely a general provision relating to qualifications of persons signing petitions, it must be construed *in pari materia* with R.C. 3501.38(A). *State ex rel. Gains v. Rossi* (1999), 86 Ohio St.3d 620, 622, 716 N.E.2d 204, 207. So construing these provisions, it is evident that the qualification date specified in R.C. 3501.38(A) is the applicable date, *i.e.*, the facts of

qualification of the persons signing referendum petitions are determined on the date when the petition is filed, not on the dates that the petition is signed. In this regard, R.C. 3503.06 does not specify *when* the person must be registered in order to sign a petition.

**{¶ 21}** In fact, as the committee cogently observes, the date that the petition is filed is the crucial date for many statutory requirements regarding election petitions. See R.C. 3501.38(G) (circulator may strike any signature from the petition before filing it in a public office); R.C. 3501.38(H) (signer of a petition may remove signature from it before it is filed in a public office); R.C. 3501.38(I) (no alterations, corrections, or additions may be made to a petition after it is filed in a public office).

**{¶ 22}** Further, if anything, R.C. 3501.38(A) is a more specific provision than R.C. 3503.06; so, to the extent that they are irreconcilable, R.C. 3501.38(A) controls. R.C. 1.51. In other words, R.C. 3503.06 generally addresses entitlement to vote or sign election petitions whereas R.C. 3501.38(A) specifies requirements for petitions, including the qualification date for petition signers.

**{¶ 23}** The Osters claim that our decision in *In re Protest Filed by Citizens for the Merit Selection of Judges, Inc.* (1990), 49 Ohio St.3d 102, 551 N.E.2d 150, requires a contrary result. In *In re Protest*, we stated in our opinion that "[a]n elector must be 'registered' in order to either vote or sign [an initiative] petition *on the day* that he or she decides to exercise the right." (Emphasis *sic*.) *Id.* at 106, 551 N.E.2d at 154. But this statement is dicta in an opinion that specified that the "sole issue" was "whether a board of elections may disqualify a signature on an initiative petition circulated pursuant to R.C. Chapter 3519 where the residence indicated by a signer is not the same as the residence on record with the board of elections for said signer." *Id.* at 103, 551 N.E.2d at 151. As the committee persuasively contends, *In re Protest* had nothing to do with qualification dates for municipal referendum petitions. Instead, it involved a statewide initiative petition to amend

the Ohio Constitution, and under R.C. 3519.15, boards of elections must count as valid signatures of these persons who are electors "at the time the boards examine the petition," not on the dates the persons sign the petition.

{¶ 24} Therefore, the mere fact that these fifty-eight persons signed the petition before each person's application for registration and/or change of residence had been filed with the board does not mandate their disqualification.

{¶ 25} The Osters further contend that forty-four of the signatures were invalid because on the date that the petition was filed, the applications for registration and change of address had not yet been approved by the board. The Osters' contention lacks merit. First, they did not specifically raise this claim in their written protest. See *State ex rel. Cooker Restaurant Corp. v. Montgomery Cty. Bd. of Elections* (1997), 80 Ohio St.3d 302, 308, 686 N.E.2d 238, 243 ("[B]ecause the alleged substantive petition defects now raised by Meyer in this action were not specified in her protest, we need not consider these issues"). In their written protest, the Osters challenged sixty petition signatures because they were not registered "*at the time they signed the Referendum Petition*" and *"[n]one of the individuals* whose names are set forth on the attached exhibit *were properly registered as electors at the time they signed the petitions* and therefor[e] were not permitted or qualified to sign the Referendum Petitions." (Emphasis added.) The Osters did not specifically challenge the signatures of the forty-four persons who signed the petition whose applications for registration and change of address were filed before the petition was filed but were approved after the petition was filed.

{¶ 26} Moreover, even if this issue were properly before us, construction of the pertinent statutory provisions supports the board's position that as long as registration and change of address applications were filed before the referendum petition was filed with the city auditor, and the applications were ultimately approved by the board, the signatures would be considered valid as of the R.C. 3501.38(A) qualifying date, *i.e.*, the date when the petition was filed.

**{¶ 27}** In this regard, our result comports with permitting electors to vote at an election as long as their applications are returned to the appropriate office no later than the thirtieth day preceding the election even though the applications are not processed and deemed satisfactory by the office until after the thirty-day period has expired. See R.C. 3503.19(A), which provides that "[a]n otherwise valid voter registration application that is returned to the appropriate office other than by mail must be received by a state or local office of a designated agency, the office of the registrar or any deputy registrar of motor vehicles, a public high school or vocational school, a public library, the office of a county treasurer, the office of the secretary of state, or the office of a board of elections no later than the thirtieth day preceding a primary, special, or general election for the person to qualify as an elector eligible to vote at that election."

**{¶ 28}** Our result is also consistent with the interpretation of the Secretary of State, who advises in a pamphlet detailing the petition process that "state law does not require that [a person's] voter registration application be processed before [the person] may sign petitions." The Secretary of State further instructs:

"Circulators may register persons whose signatures they are soliciting. If the [person] is eligible to vote on the subject of the petition and her voter registration application is received by the board of elections before the petition is filed, her signature will be counted as long as the address on the petition paper matches her address on file with the board of elections. (R.C. 3501.38, 3503.06, 3519.15.)"

**{¶ 29}** As we have repeatedly held, " 'When an election statute is subject to two different, but equally reasonable, interpretations, the interpretation of the Secretary of State, the state's chief election officer, is entitled to more weight.' " *State ex rel. Stevens v. Geauga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 223, 227, 736 N.E.2d 882, 885.

**{¶ 30}** Additionally, this result comports with our duty to liberally construe municipal referendum provisions in favor of the power reserved to the people in order to permit rather than preclude the exercise of the power and to promote rather than prevent or obstruct the object sought to be attained. See *State ex rel. Rose v. Lorain Cty. Bd. of Elections* (2000), 90 Ohio St.3d 229, 230-231, 736 N.E.2d 886, 888.

**{¶ 31}** Finally, adopting the alternate view espoused by the Osters would lead to confusing, variable qualification dates based upon when individual registration applications are processed and approved by board employees. As the evidence introduced at the protest hearing establishes, the important constitutional power of referendum reserved to the people of each municipality would then be subject to vagaries as unpredictable as board-employee staffing and employee use of sick leave and vacation time. *State ex rel. Commt. for the Referendum of Ord. No. 3543-00 v. White* (2000), 90 Ohio St.3d 212, 221, 736 N.E.2d 873, 880 (court's duty to construe statutes and charters to avoid unreasonable or absurd results).

**{¶ 32}** Based on the foregoing, after analyzing the pertinent statutes and applying the rules of construction, we hold that the applicable qualification date for signers of referendum petitions is the date the petition is filed and, as long as otherwise valid registration applications are filed before the petition is filed, persons who sign petitions before their applications are filed are qualified electors and their signatures are valid. See R.C. 3501.38(A); cf. R.C. 3519.15, which applies a similar standard to statewide initiative and referendum petitions.

R.C. 3501.38(F); Knowingly Permitting Unqualified Persons to Sign

**{¶ 33}** The Osters next contend that the board abused its discretion and disregarded R.C. 3501.38(F) by not invalidating an additional six hundred and eighty-four signatures on part-petitions in which the circulators knowingly permitted unqualified persons to sign. The Osters claim that the circulators knew

that persons who were not yet registered were unqualified to sign the referendum petition.

{¶ 34} R.C. 3501.38(F) provides that "[i]f a circulator knowingly permits an unqualified person to sign a petition paper or permits a person to write a name other than the person's own on a petition paper, that petition paper is invalid; otherwise, the signature of a person not qualified to sign shall be rejected but shall not invalidate the other valid signatures on the paper." "The word 'knowingly,' as used in the statute, is used in its ordinary and common meaning that one is aware of existing facts." *State ex rel. Carson v. Jones* (1970), 24 Ohio St.2d 70, 72, 53 O.O.2d 116, 117, 263 N.E.2d 567, 568; *State ex rel. Citizens for Responsible Taxation v. Scioto Cty. Bd. of Elections* (1992), 65 Ohio St.3d 167, 174, 602 N.E.2d 615, 621.

{¶ 35} As discussed previously, allowing nonregistered persons to complete registration applications and then sign petitions is permissible under the pertinent statutes. Therefore, the board did not err in denying the Osters' R.C. 3501.38(F) challenge.

R.C. 3503.06; Nonregistered Circulators

{¶ 36} The Osters finally assert that the board abused its discretion and disregarded R.C. 3503.06 by not striking one hundred and four signatures as invalid because three circulators were not registered at the times that these persons signed the petition.

{¶ 37} In *Buckley v. Am. Constitutional Law Found., Inc.* (1999), 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599, the United States Supreme Court held that a Colorado statute requiring that initiative-petition circulators be *registered* voters violated the First Amendment right to free speech. See, also, *Stone v. Prescott* (C.A.9, 1999), 173 F.3d 1172, 1175, where the federal court of appeals, in construing *Buckley*, observed that "where the people reserve the initiative *or referendum power*, the exercise of that power is protected by the First Amendment

applied to the States through the Fourteenth Amendment" and that a state "may not impermissibly burden the exercise of the right to petition the government by initiative *or referendum*." (Emphasis added.) It is a " 'well-settled principle of statutory construction that where constitutional questions are raised, courts will liberally construe a statute to save it from constitutional infirmities.' " *Woods v. Telb* (2000), 89 Ohio St.3d 504, 516, 733 N.E.2d 1103, 1113, quoting *State v. Sinito* (1975), 43 Ohio St.2d 98, 101, 72 O.O.2d 54, 56, 330 N.E.2d 896, 898. We therefore construe R.C. 3503.06 as not requiring that circulators be registered electors at the time that they circulate part-petitions. By so construing R.C. 3503.06, we find that the Osters' contention lacks merit.

Conclusion

{¶ 38} Based on the foregoing, the board of elections neither abused its discretion nor acted in clear disregard of applicable legal provisions in denying the Osters' protest and submitting the referendum on Lorain Ordinance No. 77-01 to the electorate at the November 6, 2001 general election. The Osters did not establish entitlement to the requested extraordinary relief in prohibition. Consequently, we deny the writ.

*Writ denied.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

*Riley, Resar & Associates, P.L.L.,* and *Kenneth R. Resar*, for relators.

*Gregory A. White*, Lorain County Prosecuting Attorney, and *Gerald A. Innes*, Assistant Prosecuting Attorney, for respondent Lorain County Board of Elections.

*Phillips & Co., L.P.A.* and *Gerald W. Phillips*, for intervening respondent.

_____