[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 592.]

THE STATE EX REL. NEWELL *v.* TUSCARAWAS COUNTY BOARD OF ELECTIONS ET AL.

[Cite as *State ex rel. Newell v. Tuscarawas Cty. Bd. of Elections*, 2001-Ohio-1806.]

*Prohibition—Writ sought to prevent Tuscarawas County Board of Elections from submitting issues proposing the repeal of voter-approved levies for the Newcomerstown Exempted Village School District to the electorate at the November 6, 2001 general election——Writ denied, when——Laches defense applicable to prohibition claims in expedited election matters.*

(No. 01-1811—Submitted October 30, 2001—Decided November 5, 2001.)

IN PROHIBITION.

————————————

*Per Curiam.*

{¶ 1} The November 5, 1963, May 6, 1969, December 9, 1969, May 5, 1970, November 4, 1975, and November 7, 1977 levies for the Newcomerstown Exempted Village School District provide over twenty mills of the 42.60 total voter-approved operating mills for the school district. On August 21, 2001, petitions were filed with respondent Tuscarawas County Board of Elections pursuant to R.C. 5705.261 to submit issues proposing the repeal of these levies to the electors of the school district.

{¶ 2} On September 10, 2001, twenty days after the petitions were filed with the board, relator, Charles E. Newell, a registered elector of Tuscarawas County, filed a protest against the petitions. This protest consisted of six general

categories of objections.[1]  Newell claimed that persons had signed petitions before their voter registration applications had been approved by the board, that certain persons had requested that their signatures be removed before the petitions were filed but their names were not removed, that some petition signers' addresses differed from their addresses filed with the board, that some signatures had been signed by someone other than the named signer, that some signatures could not be counted because they had been printed, and that certain petition papers had circulator statements specifying a signature total less than the number of signatures on the petition paper.

{¶ 3} On September 12, 2001, the board met in an emergency session and scheduled a hearing on Newell's protest for September 13.  At the September 13 hearing, the board decided to continue the hearing to permit Newell to further substantiate his protest because Newell had failed to specify all of the signatures being challenged by his protest.  Following the September 13 hearing, Newell's attorney advised the board that he would be available to complete the hearing during the week beginning September 17, but according to Newell's counsel, the board advised him that that week was unacceptable because board members would be attending the Tuscarawas County Fair.  On September 18, the board notified Newell that the hearing would be held on September 27.

{¶ 4} On September 27, the board conducted the protest hearing.  At the hearing, Newell submitted exhibits specifying the signatures he challenged and the reasons for each of his challenges.  Newell also submitted three affidavits of persons who had signed the petitions.  John L. Bryant and Bonnie Myers stated in their affidavits that a petition circulator had misrepresented the purpose of signing the petitions and that when they subsequently requested that the circulator strike

1. The September 10, 2001 protest is not part of the record in this case.  The protests that are part of Newell's evidence here were his supplemental submissions at the September 27, 2001 board hearing.

their names from the petitions, the circulator represented that he would strike the signatures, but he instead filed the petitions without striking Bryant's and Myers's names. Ida Roberts stated in her affidavit that a petition circulator misrepresented the purpose of the petitions and did not witness her sign her own name as well as her husband's name to the petitions. The board had stricken Bryant's and the Robertses' signatures from the petitions.

{¶ 5} The board noted that it would have been preferable for Newell to have requested that the board subpoena the affiants as well as other petition signers so that they could have been subject to cross-examination at the protest hearing. Newell's attorney apologized for not having these witnesses subpoenaed and claimed, without evidentiary support, that the three affiants were all unavailable to testify at the protest hearing. Newell's attorney stated that he had examined the petitions the night before the September 27 hearing to determine where it was clear that one person had signed for two persons.

{¶ 6} At the September 27 hearing, Newell requested that the board conduct a comparative analysis of petition signatures and voter registration records and that it subpoena some of the petition signers "if there is any doubt in the Board's mind that the signatures are not of whom they purport to be." When one board member asked if delaying a protest decision upon Newell's request for further board investigation would affect an election deadline, Newell's attorney asked whether there were deadlines for putting the issues on the ballot and for printing the ballots.

{¶ 7} The board, following an executive session to consult with its attorney, allowed Newell to copy voter registration records, which he had failed to submit previously, to attempt to prove his claim that certain petition signatures were written by the same person. The board's deputy director, however, testified that her comparison of the challenged signatures could not establish that they were not the valid signatures they purported to be.

**{¶ 8}** The board struck some signatures because of Newell's challenges, but ultimately denied his protest, including his claim that the petition papers containing signatures that had not been witnessed by the circulator should be stricken. The board determined that the petitions contained the following totals of valid signatures: repeal of the November 5, 1963 levy, 461 signatures; repeal of the May 6, 1969 levy, 444 signatures; repeal of the December 9, 1969 levy, 469 signatures; repeal of the May 5, 1970 levy, 465 signatures; repeal of the November 4, 1975 levy, 466 signatures; and repeal of the November 7, 1977 levy, 456 signatures. All of the petitions exceeded the four hundred and forty signatures required to place the issues on the November 6, 2001 election ballot.

**{¶ 9}** On October 11, 2001, fourteen days after the board's decision denying his protest, Newell filed this expedited election action for a writ of prohibition to prevent respondents, the board of elections, and the Secretary of State of Ohio, from placing any of the proposed issues on the November 6, 2001 election ballot. After the board filed a motion to dismiss and the Secretary of State filed an answer, Newell and the Secretary of State filed briefs, and Newell filed evidence pursuant to the expedited election schedule in S.Ct.Prac.R. X(9). The Ohio Education Association filed an *amicus curiae* brief in support of Newell. This cause is now before the court for a consideration of the merits.

**{¶ 10}** Newell seeks a writ of prohibition to prevent the submission of the issues repealing the school district levies to the electorate at the November 6, 2001 general election. In order to be entitled to the requested writ of prohibition, Newell must establish that (1) the board is about to exercise judicial or quasi-judicial power, (2) the exercise of that power is unauthorized by law, and (3) denial of the writ will cause injury for which no other adequate remedy in the ordinary course of the law exists. *Stutzman v. Madison Cty. Bd. of Elections* (2001), 93 Ohio St.3d 511, 757 N.E.2d 297.

**{¶ 11}** Despite the board's contentions to the contrary,[2] it exercised quasi-judicial authority by denying Newell's protest following an R.C. 3501.39 hearing that included the sworn testimony of the board's deputy director. *Christy v. Summit Cty. Bd. of Elections* (1996), 77 Ohio St.3d 35, 37, 671 N.E.2d 1, 3; *State ex rel. Baldzicki v. Cuyahoga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 238, 242, 736 N.E.2d 893, 897. And Newell has no other adequate remedy in the ordinary course of law to challenge the submission of the issues to the electorate. *Christy*, 77 Ohio St.3d at 37, 671 N.E.2d at 3.

**{¶ 12}** Therefore, at issue in this case is whether the board's exercise of quasi-judicial power in denying Newell's protest and placing the issues on the November 6 ballot is unauthorized. The board's decision is legally unauthorized if Newell establishes that the board engaged in fraud or corruption, abused its discretion, or acted in clear disregard of applicable legal provisions. *State ex rel. Phillips v. Lorain Cty. Bd. of Elections* (2001), 93 Ohio St.3d 535, 757 N.E.2d 319. Newell contends that the board abused its discretion and clearly disregarded applicable law, including R.C. 3501.38(E), by denying his protest and placing the issues on the November 6 ballot.

**{¶ 13}** We need not address Newell's claims. Both the board of elections and the Secretary of State assert that this case is barred by laches. As we recently observed, "[w]e have consistently required relators in election cases to act with the utmost diligence." *State ex rel. Carberry v. Ashtabula* (2001), 93 Ohio St.3d 522, 757 N.E.2d 307. A relator seeking extraordinary relief in an election-related matter bears the burden of establishing that the relator acted with the required diligence, and if the relator fails to do so, laches may bar the action. *State ex rel. Hills*

---

2. The board filed a motion to dismiss, which is generally inappropriate in expedited election cases. See *State ex rel. Ryant Commt. v. Lorain Cty. Bd. of Elections* (1999), 86 Ohio St.3d 107, 111, 712 N.E.2d 696, 700.

*Communities, Inc. v. Clermont Cty. Bd. of Elections* (2001), 91 Ohio St.3d 465, 467, 746 N.E.2d 1115, 1117-1118.

{¶ 14} Newell did not satisfy this burden here. He waited twenty days after the petitions were filed on August 21 to file his September 10 protest, and he then waited another fourteen days following the board's September 27 decision to file this action for extraordinary relief. See *State ex rel. Demaline v. Cuyahoga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 523, 526-527, 740 N.E.2d 242, 245, quoting *State ex rel. Landis v. Morrow Cty. Bd. of Elections* (2000), 88 Ohio St.3d 187, 189, 724 N.E.2d 775, 777 (" 'we have held that a delay as brief as nine days can preclude our consideration of the merits of an expedited election case' ").

{¶ 15} Newell claims that any delay was justified because the board continued the September 13 protest hearing to September 27 and that his attempts to have the protest hearing rescheduled during the week of September 17 failed because the board members did not want to miss the county fair. But any minimal delay caused by the board's alleged actions does not excuse Newell's delay in filing his protest and in instituting this action for expedited extraordinary relief. *Demaline*, 90 Ohio St.3d at 527, 740 N.E.2d at 246; *State ex rel. Manos v. Delaware Cty. Bd. of Elections* (1998), 83 Ohio St.3d 562, 563, 701 N.E.2d 371, 372.

{¶ 16} In fact, the transcript of the board's September 27 hearing indicates that the board continued the hearing from September 13 because Newell's September 10 protest, which is not contained in the evidence before the court, failed to sufficiently challenge specific signatures and that the board was affording Newell an additional opportunity to better specify and substantiate his protest. Even at the September 27 hearing, Newell did not have any witness subpoenaed to testify, and he requested at that late date that the board conduct further investigations, including subpoenaing witnesses and comparing signatures with records that Newell failed to obtain before the protest hearing. Newell's attorney also expressed ignorance of the statutory deadlines involved in expedited election matters.

**{¶ 17}** By Newell's apparent failure to comply with R.C. 3501.39(A) by not stating all of his objections in his September 10 protest with sufficient specificity, he necessitated the board's continuance of the September 13 hearing. See *Ryant Commt.*, 86 Ohio St.3d at 113, 712 N.E.2d at 701 ("By not promptly submitting a statutorily sufficient protest and by engaging in acts of gamesmanship that did not assist the board in its objective of expeditiously determining their challenges, relators commenced a sequence of dilatory actions that necessitated our order to impound the ballots for the special election"). Newell's counsel also admits that he advised the board that he could not attend a protest hearing on either September 24 or 25. Therefore, at least a portion of the delay resulting from the continuance of the hearing was attributable to Newell's actions.

**{¶ 18}** Newell also contends that in expedited election prohibition cases, the laches doctrine should not be invoked because "the decision to remove an issue from the election can be made up until the time the ballots are counted." But we have never adopted a rule exempting prohibition cases from the laches doctrine applicable to expedited election matters. For example, in *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 143, 656 N.E.2d 1277, we unanimously held that a seventeen-day delay until October 6 to file an expedited election case for a writ of prohibition to remove a candidate's name from the November 7, 1995 election ballot prevented our consideration of the prohibition claim based on laches; see, also, *Manos* (laches bars prohibition action to prevent rezoning and development issues from being placed on election ballot). Similarly, Newell delayed twenty days to submit a protest to the petitions, caused at least a portion of the delay in the continuance of the protest hearing, and then delayed another fourteen days until October 11 to file this prohibition action.

**{¶ 19}** In addition, Newell's counsel's lengthy argument at the September 27 protest hearing established that he "had a sufficient grasp of the pertinent legal

7

issues to obviate extensive research time before filing" this expedited election action. See *Carberry*, 93 Ohio St.3d at 524, 757 N.E.2d at 309.

{¶ 20} Finally, the deadline to have absentee ballots printed and ready for use for general absentee voters and to have them mailed to Armed Services absentee voters was October 2. R.C. 3509.01 and 3511.04. Newell's unjustified delays in preparing and supporting his protest, in necessitating at least a portion of the delay between the September 13 and 27 protest hearings, and in filing this action resulted in the passing of this date over a week before he filed this case. As noted previously, at the September 27 hearing, his attorney exhibited a lack of appreciation for the importance of these and other statutory deadlines in election cases. Like the relators in *Carberry*, if Newell had been more diligent, he could have had his claim resolved before the passing of these deadlines or, at a minimum, the prejudice to the board in its statutory obligations to absentee voters would have been limited to fewer affected voters. See, *e.g., Polo*; cf. *State ex rel. Squire v. Taft* (1994), 69 Ohio St.3d 365, 369, 632 N.E.2d 883, 886.

{¶ 21} Permitting Newell's belated challenge to proceed here would, as the Secretary of State persuasively argues, confuse voters and upset an election process that has already commenced. See *State ex rel. Oster v. Lorain Cty. Bd. of Elections* (2001), 93 Ohio St.3d 480, 486, 756 N.E.2d 649, 655-656 (Secretary of State is the state's chief election officer and Secretary's interpretation of election statutes is entitled to greater weight); see, also, *State ex rel. Lewis v. Hamilton Cty. Bd. of Elections* (1995), 74 Ohio St.3d 1201, 1205, 655 N.E.2d 177, 179 (Douglas, J., concurring) ("Once the election process has begun, absent a complete lack of authority to hold the election in the first instance, the process must not be disturbed").

{¶ 22} Based on the foregoing, laches bars Newell's prohibition action. Newell did not act with the diligence required in expedited election cases. By so

holding, we need not address the merits of Newell's claims. See *Carberry*, 93 Ohio St.3d at 523, 757 N.E.2d at 309. Accordingly, we deny the writ.

*Writ denied.*

MOYER, C.J., F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

RESNICK and PFEIFER, JJ., concur in judgment only.

DOUGLAS, J., dissents.

_____

**DOUGLAS, J., dissenting.**

**{¶ 23}** I respectfully dissent. For the reasons that follow, I would issue a writ of prohibition with regard to at least three of the six petitions at issue.

**{¶ 24}** In denying the writ, the majority accepts respondents' argument that this case is barred by laches. I disagree. I believe the relator has established that he acted with the required diligence in pursuing this case. He filed a written protest twenty days after the petitions were filed. Although the actual protest is not part of the record, it is clear from the transcript of the hearing before the board that the written protest detailed at least six separate categories of irregularities with regard to the circulation of the petitions. In preparing his protest, relator examined and compared over two thousand seven hundred signatures contained in the six petitions and interviewed and obtained affidavits from persons who had signed the petition regarding irregularities in the circulation of the petitions. I believe that relator acted with due diligence in this regard. Moreover, neither respondent argues this as grounds for laches, but, rather, both argue that the claim is barred by laches because relator did not file his action in this court until fourteen days after the board denied his protest.

**{¶ 25}** I would find that respondents are estopped from raising laches as a defense because of the board's prior action of continuing the September 13 protest hearing for fourteen days. The majority finds that the continuance was necessitated by relator's failure to comply with R.C. 3501.39(A) by not stating all of his

objections in his September 10 protest with sufficient specificity. I disagree with that finding.

{¶ 26} The transcript from the September 27 hearing indicates that at the September 13 hearing, Thomas Hisrich, chairman of the board, instructed relator to narrow his protest to just those signatures that the board certified as valid. The September 13 hearing was then continued to allow relator time to narrow his protest. Contrary to the majority's assertion, this is not a requirement of R.C. 3501.39(A). It is clear to me that the hearing was continued as a matter of convenience to the board members who did not want to "waste a lot of time" listening to relator's protests regarding petition signatures that were not certified.

{¶ 27} Relator advised Hisrich that he would be ready to continue the proceedings the following Monday, September 17. Hisrich informed relator that the board would be unable to hold the hearing the week of September 17 because members of the board wished to attend the Tuscarawas County Fair that was scheduled for that week. Therefore, Hisrich set September 27, fourteen days later, as the date for further hearing. Thus, I conclude that respondents are estopped from raising laches based on relator's fourteen-day delay in filing his complaint in this court when the board delayed the protest hearing fourteen days so its members could attend the county fair. For the foregoing reasons, I would reject respondents' laches defense and reach the merits of this case.

{¶ 28} Relator raised numerous objections to the petitions in his protest before the board and in his complaint before this court. One stands out and is supported by the evidence. That objection relates to the circulator affidavit that, pursuant to R.C. 3501.38, must be on each part-petition. R.C. 3501.38 provides that all petitions filed with a board of elections on any issue "shall" be governed by the following:

"(E) On each petition paper the circulator shall indicate the number of signatures contained thereon, and shall sign a statement made under penalty of

10

election falsification that *he witnessed the affixing of every signature*, that all signers were to the best of his knowledge and belief qualified to sign, and that every signature is to the best of his knowledge and belief the signature of the person whose signature it purports to be." (Emphasis added.)

{¶ 29} Relator's protest included the assertion that a petition circulator, Chester McVey, who had submitted part-petitions on each issue, had executed faulty affidavits on some of the part-petitions he circulated. In support of his contention, relator offered an affidavit executed by Ida Roberts. That affidavit contains the following statements:

"2. On July 5, 2001, Chester McVey came to Affiant's home with several petitions which he said were to lower property taxes and fix roads.

"* * *

"4. Chester McVey waited on Affiant's porch while Affiant took the petitions inside her house.

"5. While Affiant was inside her home, Affiant signed her name and that of her husband, Ollie Roberts, to the petitions.

"6. Affiant returned to her porch with the petitions and handed them back to Chester McVey bearing the names of both Affiant and Ollie Roberts.

"* * *

"8. Chester McVey did not personally witness Affiant affix her signature to the petitions or sign her husband's name on the petitions."

{¶ 30} Because no evidence was submitted at the hearing to rebut this affidavit, the board should have found that McVey had executed faulty affidavits on the part-petitions containing Ida Roberts's signature. Furthermore, because election laws are mandatory and require strict compliance, *State ex rel. Citizens for Responsible Taxation v. Scioto Cty. Bd. of Elections* (1992), 65 Ohio St.3d 167, 169, 602 N.E.2d 615, 617, the entire part-petitions containing the faulty affidavits should have been invalidated for failure to comply with R.C. 3501.38(E).

{¶ 31} The record shows that the board certified twenty-four to twenty-six signatures on each of the six part-petitions containing Ida Roberts's signature. (Ida Roberts signed a part-petition for each of the six issues.) Because I would find that these signatures should not have been certified, I would subtract the appropriate number from the number of signatures certified by the board on each petition and then determine whether each of the six petitions had the required number of signatures to place them on the ballot.

{¶ 32} Accordingly, the board certified four hundred sixty-one signatures on the petition to repeal the November 5, 1963 levy. I would subtract twenty-five from that total, leaving four hundred thirty-six valid signatures. Because each petition was required to have at least four hundred forty signatures to be placed on the ballot, I would find the number of signatures on this petition insufficient and would issue a writ of prohibition as to the petition to repeal the November 5, 1963 levy. Similarly, the board certified four hundred forty-four signatures on the petition to repeal the May 6, 1969 levy and four hundred fifty-six signatures on the petition to repeal the November 7, 1977 levy. Thus, reducing these totals by twenty-five and twenty-six respectively leaves fewer than four hundred forty signatures on each. Therefore, I would also issue a writ with regard to these petitions.

{¶ 33} On the other hand, the board certified four hundred sixty-nine signatures on the petition to repeal the December 9, 1969 levy. Subtracting twenty-five signatures from that total leaves four hundred forty-four valid signatures, which are more than the four hundred forty signatures required. Thus, I would not issue a writ of prohibition as to the petition to repeal the December 9, 1969 levy. Likewise, the board certified four hundred sixty-five signatures on the petition to repeal the May 5, 1970 levy and four hundred sixty-six signatures on the petition to repeal the November 4, 1975 levy. Thus, when these totals are reduced by twenty-five and twenty-four respectively they still have the required number of

12

signatures to place these issues on the ballot. Notwithstanding these computations, it appears from the face of the petitions that they would be subject to further challenge upon other statutory and evidentiary grounds. However, neither the board nor the relator pursued these issues at the hearing by developing or producing competent, sworn evidence to the apparent irregularities. Therefore, I would not issue a writ with regard to these petitions.

{¶ 34} Accordingly, I would issue a writ with regard to the petition to repeal the November 5, 1963 levy, the petition to repeal the May 6, 1969 levy, and the petition to repeal the November 7, 1977 levy. I recognize that ballots have been prepared and the election is already underway through absentee ballots. Thus, in issuing a writ I would indicate that the votes cast on the three issues specified above should not be tabulated.

––––––––––––––––––

*Squire, Sanders & Dempsey, L.L.P., David J. Young* and *Michael R. Reed*, for relator.

*Michael A. Cochran*, Tuscarawas County Assistant Prosecuting Attorney, for respondent Tuscarawas County Board of Elections.

*Betty D. Montgomery*, Attorney General, *Darrell M. Pierre, Jr.*, and *Elizabeth Luper Schuster*, Assistant Attorneys General, for respondent Secretary of State of Ohio.

*Susan J. Kyte*, urging granting of the writ for *amicus curiae*, Ohio Education Association.

––––––––––––––––––